# CITY OF CHICAGO *v.* MORALES ET AL.

No. 97–1121.  Argued December 9, 1998—Decided June 10, 1999

42

STEVENS, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, and V, in which O'CON-NOR, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined, and an opinion with respect to Parts III, IV, and VI, in which SOUTER and GINS-BURG, JJ., joined. O'CONNOR, J., filed an opinion concurring in part and concurring in the judgment, in which BREYER, J., joined, *post,* p. 64. KENNEDY, J., *post,* p. 69, and BREYER, J., *post,* p. 70, filed opinions concurring in part and concurring in the judgment. SCALIA, J., filed a dissenting opinion, *post,* p. 73. THOMAS, J., filed a dissenting opinion, in which REHN-QUIST, C. J., and SCALIA, J., joined, *post,* p. 98.

*Lawrence Rosenthal* argued the cause for petitioner. With him on the briefs were *Brian L. Crowe, Benna Ruth Solomon, Timothy W. Joranko,* and *Julian N. Henriques, Jr.*

*Harvey Grossman* argued the cause for respondents. With him on the brief were *Rita Fry, James H. Reddy, Richard J. O'Brien, Jr., Barbara O'Toole,* and *Steven R. Shapiro.**

---

*Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Waxman, Deputy Solicitor General Underwood,* and *James A. Feldman;* for the State of Ohio et al. by *Betty D. Montgomery,* Attorney General of Ohio, *Jeffrey S. Sutton,* State Solicitor, *Robert C. Maier,* and *David M. Gormley,* and by the Attorneys General for their respective jurisdictions as follows: *William H. Pryor, Jr.,* of Alabama,

JUSTICE STEVENS announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, and V, and an opinion with respect to Parts III, IV, and VI, in which JUSTICE SOUTER and JUSTICE GINSBURG join.

In 1992, the Chicago City Council enacted the Gang Congregation Ordinance, which prohibits "criminal street gang

Bruce M. Botelho of Alaska, Grant Woods of Arizona, Daniel E. Lungren of California, Gale A. Norton of Colorado, John M. Bailey of Connecticut, M. Jane Brady of Delaware, Robert A. Butterworth of Florida, Thurbert E. Baker of Georgia, James E. Ryan of Illinois, Jeffrey A. Modisett of Indiana, Carla J. Stovall of Kansas, A. B. Chandler III of Kentucky, Richard P. Ieyoub of Louisiana, J. Joseph Curran, Jr., of Maryland, Frank J. Kelley of Michigan, Hubert H. Humphrey III of Minnesota, Michael C. Moore of Mississippi, Jeremiah W. (Jay) Nixon of Missouri, Joseph P. Mazurek of Montana, Don Stenberg of Nebraska, Frankie Sue Del Papa of Nevada, Dennis C. Vacco of New York, Michael F. Easley of North Carolina, D. Michael Fisher of Pennsylvania, Carlos Lugo-Fiol of Puerto Rico, Jeffrey B. Pine of Rhode Island, Charles M. Condon of South Carolina, Mark Barnett of South Dakota, Jan Graham of Utah, Julio A. Brady of the Virgin Islands, and Mark O. Earley of Virginia; for the Center for the Community Interest by Richard K. Willard and Roger L. Conner; for the Chicago Neighborhood Organizations by Michele L. Odorizzi and Jeffrey W. Sarles; for the Los Angeles County District Attorney by Gil Garcetti pro se, and Brent Dail Riggs; for the National District Attorneys Association et al. by Kristin Linsley Myles, Daniel P. Collins, William L. Murphy, and Wayne W. Schmidt; for the Washington Legal Foundation et al. by Daniel J. Popeo and Richard A. Samp; and for the U. S. Conference of Mayors et al. by Richard Ruda, Miguel A. Estrada, and Mark A. Perry.

Briefs of amicus curiae urging affirmance were filed for the Chicago Alliance for Neighborhood Safety et al. by Stephen J. Schulhofer and Randolph N. Stone; for the Illinois Attorneys for Criminal Justice by Robert Hirschhorn and Steven A. Greenberg; for the National Association of Criminal Defense Lawyers by David M. Porter; for the National Black Police Association et al. by Elaine R. Jones, Theodore M. Shaw, George H. Kendall, Laura E. Hankins, Marc O. Beem, and Diane F. Klotnia; for the National Law Center on Homelessness & Poverty et al. by Robert M. Bruskin; and for See Forever/the Maya Angelou Public Charter School et al. by Louis R. Cohen, John Payton, and James Forman, Jr.

members" from "loitering" with one another or with other persons in any public place. The question presented is whether the Supreme Court of Illinois correctly held that the ordinance violates the Due Process Clause of the Fourteenth Amendment to the Federal Constitution.

## I

Before the ordinance was adopted, the city council's Committee on Police and Fire conducted hearings to explore the problems created by the city's street gangs, and more particularly, the consequences of public loitering by gang members. Witnesses included residents of the neighborhoods where gang members are most active, as well as some of the aldermen who represent those areas. Based on that evidence, the council made a series of findings that are included in the text of the ordinance and explain the reasons for its enactment.[1]

The council found that a continuing increase in criminal street gang activity was largely responsible for the city's rising murder rate, as well as an escalation of violent and drug related crimes. It noted that in many neighborhoods throughout the city, "'the burgeoning presence of street gang members in public places has intimidated many law abiding citizens.'" 177 Ill. 2d 440, 445, 687 N. E. 2d 53, 58 (1997). Furthermore, the council stated that gang members "'establish control over identifiable areas . . . by loitering in those areas and intimidating others from entering those areas; and . . . [m]embers of criminal street gangs avoid arrest by committing no offense punishable under existing laws when they know the police are present . . . .'" *Ibid.* It further found that "'loitering in public places by

---

[1] The findings are quoted in full in the opinion of the Supreme Court of Illinois. 177 Ill. 2d 440, 445, 687 N. E. 2d 53, 58 (1997). Some of the evidence supporting these findings is quoted in JUSTICE THOMAS' dissenting opinion. *Post,* at 100–101.

criminal street gang members creates a justifiable fear for the safety of persons and property in the area'" and that "'[a]ggressive action is necessary to preserve the city's streets and other public places so that the public may use such places without fear.'" Moreover, the council concluded that the city "'has an interest in discouraging all persons from loitering in public places with criminal gang members.'" *Ibid.*

The ordinance creates a criminal offense punishable by a fine of up to $500, imprisonment for not more than six months, and a requirement to perform up to 120 hours of community service. Commission of the offense involves four predicates. First, the police officer must reasonably believe that at least one of the two or more persons present in a "'public place'" is a "'criminal street membe[r].'" Second, the persons must be "'loitering,'" which the ordinance defines as "'remain[ing] in any one place with no apparent purpose.'" Third, the officer must then order "'all'" of the persons to disperse and remove themselves "'from the area.'" Fourth, a person must disobey the officer's order. If any person, whether a gang member or not, disobeys the officer's order, that person is guilty of violating the ordinance. *Ibid.*[2]

---

[2] The ordinance states in pertinent part:

"(a) Whenever a police officer observes a person whom he reasonably believes to be a criminal street gang member loitering in any public place with one or more other persons, he shall order all such persons to disperse and remove themselves from the area. Any person who does not promptly obey such an order is in violation of this section.

"(b) It shall be an affirmative defense to an alleged violation of this section that no person who was observed loitering was in fact a member of a criminal street gang.

"(c) As used in this Section:

"(1) 'Loiter' means to remain in any one place with no apparent purpose.

"(2) 'Criminal street gang' means any ongoing organization, association in fact or group of three or more persons, whether formal or informal, having as one of its substantial activities the commission of one or more of the criminal acts enumerated in paragraph (3), and whose members

48

Two months after the ordinance was adopted, the Chicago Police Department promulgated General Order 92–4 to provide guidelines to govern its enforcement.[3] That order purported to establish limitations on the enforcement discretion of police officers "to ensure that the anti-gang loitering ordinance is not enforced in an arbitrary or discriminatory way." Chicago Police Department, General Order 92–4, reprinted in App. to Pet. for Cert. 65a. The limitations confine the authority to arrest gang members who violate the ordinance to sworn "members of the Gang Crime Section" and certain other designated officers,[4] and establish detailed criteria for defining street gangs and membership in such gangs. *Id.*, at 66a–67a. In addition, the order directs district commanders to "designate areas in which the presence of gang members has a demonstrable effect on the activities of law abiding persons in the surrounding community," and provides that the ordinance "will be enforced only within the desig-

individually or collectively engage in or have engaged in a pattern of criminal gang activity.

. . . . .

"(5) 'Public place' means the public way and any other location open to the public, whether publicly or privately owned.

"(e) Any person who violates this Section is subject to a fine of not less than $100 and not more than $500 for each offense, or imprisonment for not more than six months, or both.

"In addition to or instead of the above penalties, any person who violates this section may be required to perform up to 120 hours of community service pursuant to section 1–4–120 of this Code." Chicago Municipal Code §8–4–015 (added June 17, 1992), reprinted in App. to Pet. for Cert. 61a–63a.

[3] As the Illinois Supreme Court noted, during the hearings preceding the adoption of the ordinance, "representatives of the Chicago law and police departments informed the city counsel that any limitations on the discretion police have in enforcing the ordinance would be best developed through police policy, rather than placing such limitations into the ordinance itself." 177 Ill. 2d, at 446, 687 N. E. 2d, at 58–59.

[4] Presumably, these officers would also be able to arrest all nongang members who violate the ordinance.

nated areas." *Id.*, at 68a–69a. The city, however, does not release the locations of these "designated areas" to the public.[5]

## II

During the three years of its enforcement,[6] the police issued over 89,000 dispersal orders and arrested over 42,000 people for violating the ordinance.[7] In the ensuing enforcement proceedings, 2 trial judges upheld the constitutionality of the ordinance, but 11 others ruled that it was invalid.[8] In respondent Youkhana's case, the trial judge held that the "ordinance fails to notify individuals what conduct

---

[5] Tr. of Oral Arg. 22–23.

[6] The city began enforcing the ordinance on the effective date of the general order in August 1992 and stopped enforcing it in December 1995, when it was held invalid in *Chicago* v. *Youkhana*, 277 Ill. App. 3d 101, 660 N. E. 2d 34 (1995). Tr. of Oral Arg. 43.

[7] Brief for Petitioner 16. There were 5,251 arrests under the ordinance in 1993, 15,660 in 1994, and 22,056 in 1995. City of Chicago, R. Daley & T. Hillard, Gang and Narcotic Related Violent Crime: 1993–1997, p. 7 (June 1998).

The city believes that the ordinance resulted in a significant decline in gang-related homicides. It notes that in 1995, the last year the ordinance was enforced, the gang-related homicide rate fell by 26%. In 1996, after the ordinance had been held invalid, the gang-related homicide rate rose 11%. Pet. for Cert. 9, n. 5. However, gang-related homicides fell by 19% in 1997, over a year after the suspension of the ordinance. Daley & Hillard, at 5. Given the myriad factors that influence levels of violence, it is difficult to evaluate the probative value of this statistical evidence, or to reach any firm conclusion about the ordinance's efficacy. Cf. Harcourt, Reflecting on the Subject: A Critique of the Social Influence Conception of Deterrence, the Broken Windows Theory, and Order-Maintenance Policing New York Style, 97 Mich. L. Rev. 291, 296 (1998) (describing the "hotly contested debate raging among . . . experts over the causes of the decline in crime in New York City and nationally").

[8] See Poulos, Chicago's Ban on Gang Loitering: Making Sense of Vagueness and Overbreadth in Loitering Laws, 83 Calif. L. Rev. 379, 384, n. 26 (1995).

is prohibited, and it encourages arbitrary and capricious enforcement by police."[9]

The Illinois Appellate Court affirmed the trial court's ruling in the *Youkhana* case,[10] consolidated and affirmed other pending appeals in accordance with *Youkhana*,[11] and reversed the convictions of respondents Gutierrez, Morales, and others.[12] The Appellate Court was persuaded that the ordinance impaired the freedom of assembly of nongang members in violation of the First Amendment to the Federal Constitution and Article I of the Illinois Constitution, that it was unconstitutionally vague, that it improperly criminalized status rather than conduct, and that it jeopardized rights guaranteed under the Fourth Amendment.[13]

The Illinois Supreme Court affirmed. It held "that the gang loitering ordinance violates due process of law in that it is impermissibly vague on its face and an arbitrary restriction on personal liberties." 177 Ill. 2d, at 447, 687 N. E. 2d, at 59. The court did not reach the contentions that the ordinance "creates a status offense, permits arrests without probable cause or is overbroad." *Ibid.*

In support of its vagueness holding, the court pointed out that the definition of "loitering" in the ordinance drew no distinction between innocent conduct and conduct calculated

---

[9] *Chicago* v. *Youkhana*, Nos. 93 MCI 293363 et al. (Ill. Cir. Ct., Cook Cty., Sept. 29, 1993), App. to Pet. for Cert. 45a. The court also concluded that the ordinance improperly authorized arrest on the basis of a person's status instead of conduct and that it was facially overbroad under the First Amendment to the Federal Constitution and Art. I, §5, of the Illinois Constitution. *Id.*, at 59a.

[10] *Chicago* v. *Youkhana*, 277 Ill. App. 3d 101, 660 N. E. 2d 34 (1995).

[11] *Chicago* v. *Ramsey*, Nos. 1-93-4125 et al. (Ill. App., Dec. 29, 1995), App. to Pet. for Cert. 39a.

[12] *Chicago* v. *Morales*, Nos. 1-93-4039 et al. (Ill. App., Dec. 29, 1995), App. to Pet. for Cert. 37a.

[13] *Chicago* v. *Youkhana*, 277 Ill. App. 3d, at 106, 660 N. E. 2d, at 38; *id.*, at 112, 660 N. E. 2d, at 41; *id.*, at 113, 660 N. E. 2d, at 42.

to cause harm.[14] "Moreover, the definition of 'loiter' provided by the ordinance does not assist in clearly articulating the proscriptions of the ordinance." *Id.*, at 451–452, 687 N. E. 2d, at 60–61. Furthermore, it concluded that the ordinance was "not reasonably susceptible to a limiting construction which would affirm its validity."[15]

We granted certiorari, 523 U. S. 1071 (1998), and now affirm. Like the Illinois Supreme Court, we conclude that the ordinance enacted by the city of Chicago is unconstitutionally vague.

## III

The basic factual predicate for the city's ordinance is not in dispute. As the city argues in its brief, "the very presence of a large collection of obviously brazen, insistent, and lawless gang members and hangers-on on the public ways intimidates residents, who become afraid even to leave their homes and go about their business. That, in turn, imperils community residents' sense of safety and security, detracts from property values, and can ultimately destabilize entire neighborhoods."[16] The findings in the ordinance explain that it was motivated by these concerns. We have no doubt

---

[14] "The ordinance defines 'loiter' to mean 'to remain in any one place with no apparent purpose.' Chicago Municipal Code §8–4–015(c)(1) (added June 17, 1992). People with entirely legitimate and lawful purposes will not always be able to make their purposes apparent to an observing police officer. For example, a person waiting to hail a taxi, resting on a corner during a jog, or stepping into a doorway to evade a rain shower has a perfectly legitimate purpose in all these scenarios; however, that purpose will rarely be apparent to an observer." 177 Ill. 2d, at 451–452, 687 N. E. 2d, at 60–61.

[15] It stated: "Although the proscriptions of the ordinance are vague, the city council's intent in its enactment is clear and unambiguous. The city has declared gang members a public menace and determined that gang members are too adept at avoiding arrest for all the other crimes they commit. Accordingly, the city council crafted an exceptionally broad ordinance which could be used to sweep these intolerable and objectionable gang members from the city streets." *Id.*, at 458, 687 N. E. 2d, at 64.

[16] Brief for Petitioner 14.

that a law that directly prohibited such intimidating conduct would be constitutional,[17] but this ordinance broadly covers a significant amount of additional activity. Uncertainty about the scope of that additional coverage provides the basis for respondents' claim that the ordinance is too vague.

We are confronted at the outset with the city's claim that it was improper for the state courts to conclude that the ordinance is invalid on its face. The city correctly points out that imprecise laws can be attacked on their face under two different doctrines.[18] First, the overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when "judged in relation to the statute's plainly legitimate sweep." *Broadrick* v. *Oklahoma*, 413 U. S. 601, 612–615 (1973). Second, even if an enactment does not reach a substantial amount of constitutionally protected conduct, it may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests. *Kolender* v. *Lawson*, 461 U. S. 352, 358 (1983).

While we, like the Illinois courts, conclude that the ordinance is invalid on its face, we do not rely on the overbreadth doctrine. We agree with the city's submission that the law does not have a sufficiently substantial impact on conduct

---

[17] In fact the city already has several laws that serve this purpose. See, *e. g.*, Ill. Comp. Stat., ch. 720 §§ 5/12–6 (1998) (intimidation); 570/405.2 (streetgang criminal drug conspiracy); 147/1 *et seq.* (Illinois Streetgang Terrorism Omnibus Prevention Act); 5/25–1 (mob action). Deputy Superintendent Cooper, the only representative of the police department at the Committee on Police and Fire hearing on the ordinance, testified that, of the kinds of behavior people had discussed at the hearing, "90 percent of those instances are actually criminal offenses where people, in fact, can be arrested." Record, Appendix II to plaintiff's Memorandum in Opposition to Motion to Dismiss 182 (Tr. of Proceedings, Chicago City Council Committee on Police and Fire, May 18, 1992).

[18] Brief for Petitioner 17.

protected by the First Amendment to render it unconstitutional. The ordinance does not prohibit speech. Because the term "loiter" is defined as remaining in one place "with no apparent purpose," it is also clear that it does not prohibit any form of conduct that is apparently intended to convey a message. By its terms, the ordinance is inapplicable to assemblies that are designed to demonstrate a group's support of, or opposition to, a particular point of view. Cf. *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288 (1984); *Gregory* v. *Chicago*, 394 U. S. 111 (1969). Its impact on the social contact between gang members and others does not impair the First Amendment "right of association" that our cases have recognized. See *Dallas* v. *Stanglin*, 490 U. S. 19, 23–25 (1989).

On the other hand, as the United States recognizes, the freedom to loiter for innocent purposes is part of the "liberty" protected by the Due Process Clause of the Fourteenth Amendment.[19] We have expressly identified this "right to remove from one place to another according to inclination" as "an attribute of personal liberty" protected by the Constitution. *Williams* v. *Fears*, 179 U. S. 270, 274 (1900); see also *Papachristou* v. *Jacksonville*, 405 U. S. 156, 164 (1972).[20]

---

[19] See Brief for United States as *Amicus Curiae* 23: "We do not doubt that, under the Due Process Clause, individuals in this country have significant liberty interests in standing on sidewalks and in other public places, and in traveling, moving, and associating with others." The city appears to agree, at least to the extent that such activities include "social gatherings." Brief for Petitioner 21, n. 13. Both JUSTICE SCALIA, *post*, at 83–86 (dissenting opinion), and JUSTICE THOMAS, *post*, at 102–106 (dissenting opinion), not only disagree with this proposition, but also incorrectly assume (as the city does not, see Brief for Petitioner 44) that identification of an obvious liberty interest that is impacted by a statute is equivalent to finding a violation of substantive due process. See n. 35, *infra*.

[20] Petitioner cites historical precedent against recognizing what it describes as the "fundamental right to loiter." Brief for Petitioner 12. While antiloitering ordinances have long existed in this country, their pedigree does not ensure their constitutionality. In 16th-century England, for example, the "'Slavery acts'" provided for a 2-year enslavement period

Indeed, it is apparent that an individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is "a part of our heritage" *Kent* v. *Dulles*, 357 U. S. 116, 126 (1958), or the right to move "to whatsoever place one's own inclination may direct" identified in Blackstone's Commentaries. 1 W. Blackstone, Commentaries on the Laws of England 130 (1765).[21]

---

for anyone who "'liveth idly and loiteringly, by the space of three days.'" Note, Homelessness in a Modern Urban Setting, 10 Ford. Urb. L. J. 749, 754, n. 17 (1982). In *Papachristou* we noted that many American vagrancy laws were patterned on these "Elizabethan poor laws." 405 U. S., at 161–162. These laws went virtually unchallenged in this country until attorneys became widely available to the indigent following our decision in *Gideon* v. *Wainwright*, 372 U. S. 335 (1963). See Recent Developments, Constitutional Attacks on Vagrancy Laws, 20 Stan. L. Rev. 782, 783 (1968). In addition, vagrancy laws were used after the Civil War to keep former slaves in a state of quasi slavery. In 1865, for example, Alabama broadened its vagrancy statute to include "'any runaway, stubborn servant or child'" and "'a laborer or servant who loiters away his time, or refuses to comply with any contract for a term of service without just cause.'" T. Wilson, Black Codes of the South 76 (1965). The Reconstruction-era vagrancy laws had especially harsh consequences on African-American women and children. L. Kerber, No Constitutional Right to be Ladies: Women and the Obligations of Citizenship 50–69 (1998). Neither this history nor the scholarly compendia in JUSTICE THOMAS' dissent, *post*, at 102–106, persuades us that the right to engage in loitering that is entirely harmless in both purpose and effect is not a part of the liberty protected by the Due Process Clause.

[21] The freewheeling and hypothetical character of JUSTICE SCALIA's discussion of liberty is epitomized by his assumption that citizens of Chicago, who were once "free to drive about the city" at whatever speed they wished, were the ones who decided to limit that freedom by adopting a speed limit. *Post*, at 73. History tells quite a different story.

In 1903, the Illinois Legislature passed "An Act to regulate the speed of automobiles and other horseless conveyances upon the public streets, roads, and highways of the state of Illinois." That statute, with some exceptions, set a speed limit of 15 miles per hour. See *Christy* v. *Elliott*, 216 Ill. 31, 74 N. E. 1035 (1905). In 1900, there were 1,698,575 citizens of Chicago, 1 Twelfth Census of the United States 430 (1900) (Table 6), but

There is no need, however, to decide whether the impact of the Chicago ordinance on constitutionally protected liberty alone would suffice to support a facial challenge under the overbreadth doctrine. Cf. *Aptheker* v. *Secretary of State,* 378 U. S. 500, 515–517 (1964) (right to travel); *Planned Parenthood of Central Mo.* v. *Danforth,* 428 U. S. 52, 82–83 (1976) (abortion); *Kolender* v. *Lawson,* 461 U. S., at 355, n. 3, 358–360, and n. 9. For it is clear that the vagueness of this enactment makes a facial challenge appropriate. This is not an ordinance that "simply regulates business behavior and contains a scienter requirement." See *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.,* 455 U. S. 489, 499 (1982). It is a criminal law that contains no *mens rea* requirement, see *Colautti* v. *Franklin,* 439 U. S. 379, 395 (1979), and infringes on constitutionally protected rights, see *id.,* at 391. When vagueness permeates the text of such a law, it is subject to facial attack.[22]

---

only 8,000 cars (both private and commercial) registered in the entire United States. See Ward's Automotive Yearbook 230 (1990). Even though the number of cars in the country had increased to 77,400 by 1905, *ibid.,* it seems quite clear that it was pedestrians, rather than drivers, who were primarily responsible for Illinois' decision to impose a speed limit.

[22] The burden of the first portion of JUSTICE SCALIA's dissent is virtually a facial challenge to the facial challenge doctrine. See *post,* at 74–83. He first lauds the "clarity of our general jurisprudence" in the method for assessing facial challenges and then states that the clear import of our cases is that, in order to mount a successful facial challenge, a plaintiff must "establish that no set of circumstances exists under which the Act would be valid." See *post,* at 78–79 (emphasis deleted); *United States* v. *Salerno,* 481 U. S. 739, 745 (1987). To the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of this Court, including *Salerno* itself (even though the defendants in that case did not claim that the statute was unconstitutional as applied to them, see *id.,* at 745, n. 3, the Court nevertheless entertained their facial challenge). Since we, like the Illinois Supreme Court, conclude that vagueness permeates the ordinance, a facial challenge is appropriate.

We need not, however, resolve the viability of *Salerno*'s dictum, because this case comes to us from a state—not a federal—court. When asserting

56

Vagueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement. See *Kolender* v. *Lawson,* 461 U. S., at 357. Accordingly, we first consider whether the ordinance provides fair notice to the citizen and then discuss its potential for arbitrary enforcement.

IV

"It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits . . . ." *Giaccio* v. *Pennsylvania,* 382 U. S. 399, 402–403 (1966). The Illinois Supreme Court recognized that the term "loiter" may have a common and accepted meaning, 177 Ill. 2d, at 451, 687 N. E. 2d, at 61, but the definition of that term in this ordinance—"to remain in any one place with no apparent purpose"—does not. It is difficult to imagine how

a facial challenge, a party seeks to vindicate not only his own rights, but those of others who may also be adversely impacted by the statute in question. In this sense, the threshold for facial challenges is a species of third party *(jus tertii)* standing, which we have recognized as a prudential doctrine and not one mandated by Article III of the Constitution. See *Secretary of State of Md.* v. *Joseph H. Munson Co.,* 467 U. S. 947, 955 (1984). When a state court has reached the merits of a constitutional claim, "invoking prudential limitations on [the respondent's] assertion of *jus tertii* would serve no functional purpose." *City of Revere* v. *Massachusetts Gen. Hospital,* 463 U. S. 239, 243 (1983) (internal quotation marks omitted).

Whether or not it would be appropriate for federal courts to apply the *Salerno* standard in some cases—a proposition which is doubtful—state courts need not apply prudential notions of standing created by this Court. See *ASARCO Inc.* v. *Kadish,* 490 U. S. 605, 618 (1989). JUSTICE SCALIA's assumption that state courts must apply the restrictive *Salerno* test is incorrect as a matter of law; moreover it contradicts "essential principles of federalism." See Dorf, Facial Challenges to State and Federal Statutes, 46 Stan. L. Rev. 235, 284 (1994).

any citizen of the city of Chicago standing in a public place with a group of people would know if he or she had an "apparent purpose." If she were talking to another person, would she have an apparent purpose? If she were frequently checking her watch and looking expectantly down the street, would she have an apparent purpose?[23]

Since the city cannot conceivably have meant to criminalize each instance a citizen stands in public with a gang member, the vagueness that dooms this ordinance is not the product of uncertainty about the normal meaning of "loitering," but rather about what loitering is covered by the ordinance and what is not. The Illinois Supreme Court emphasized the law's failure to distinguish between innocent conduct and conduct threatening harm.[24] Its decision followed the precedent set by a number of state courts that have upheld ordinances that criminalize loitering combined with some other overt act or evidence of criminal intent.[25] However, state

---

[23] The Solicitor General, while supporting the city's argument that the ordinance is constitutional, appears to recognize that the ordinance cannot be read literally without invoking intractable vagueness concerns. "[T]he purpose simply to stand on a corner cannot be an 'apparent purpose' under the ordinance; if it were, the ordinance would prohibit nothing at all." Brief for United States as *Amicus Curiae* 12–13.

[24] 177 Ill. 2d, at 452, 687 N. E. 2d, at 61. One of the trial courts that invalidated the ordinance gave the following illustration: "Suppose a group of gang members were playing basketball in the park, while waiting for a drug delivery. Their apparent purpose is that they are in the park to play ball. The actual purpose is that they are waiting for drugs. Under this definition of loitering, a group of people innocently sitting in a park discussing their futures would be arrested, while the 'basketball players' awaiting a drug delivery would be left alone." *Chicago* v. *Youkhana*, Nos. 93 MCI 293363 et al. (Ill. Cir. Ct., Cook Cty., Sept. 29, 1993), App. to Pet. for Cert. 48a–49a.

[25] See, *e. g., Tacoma* v. *Luvene*, 118 Wash. 2d 826, 827 P. 2d 1374 (1992) (upholding ordinance criminalizing loitering with purpose to engage in drug-related activities); *People* v. *Superior Court*, 46 Cal. 3d 381, 394–395, 758 P. 2d 1046, 1052 (1988) (upholding ordinance criminalizing loitering for the purpose of engaging in or soliciting lewd act).

courts have uniformly invalidated laws that do not join the term "loitering" with a second specific element of the crime.[26]

The city's principal response to this concern about adequate notice is that loiterers are not subject to sanction until after they have failed to comply with an officer's order to disperse. "[W]hatever problem is created by a law that criminalizes conduct people normally believe to be innocent is solved when persons receive actual notice from a police order of what they are expected to do."[27] We find this response unpersuasive for at least two reasons.

First, the purpose of the fair notice requirement is to enable the ordinary citizen to conform his or her conduct to the law. "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." *Lanzetta* v. *New Jersey*, 306 U. S. 451, 453 (1939). Although it is true that a loiterer is not subject to criminal sanctions unless he or she disobeys a dispersal order, the loitering is the conduct that the ordinance is designed to prohibit.[28] If the loitering is in fact harmless and innocent, the dispersal order itself is an unjustified impairment of liberty. If the police are able to decide arbitrarily which members of the public they will order to disperse, then the Chicago ordinance becomes indistinguishable from the law we held invalid in *Shuttlesworth* v. *Birmingham*, 382 U. S. 87, 90

---

[26] See, *e. g.*, *State* v. *Richard*, 108 Nev. 626, 627, n. 2, 836 P. 2d 622, 623, n. 2 (1992) (striking down statute that made it unlawful "for any person to loiter or prowl upon the property of another without lawful business with the owner or occupant thereof").

[27] Brief for Petitioner 31.

[28] In this way, the ordinance differs from the statute upheld in *Colten* v. *Kentucky*, 407 U. S. 104, 110 (1972). There, we found that the illegality of the underlying conduct was clear. "Any person who stands in a group of persons along a highway where the police are investigating a traffic violation and seeks to engage the attention of an officer issuing a summons should understand that he could be convicted under . . . Kentucky's statute if he fails to obey an order to move on." *Ibid.*

(1965).[29]  Because an officer may issue an order only after prohibited conduct has already occurred, it cannot provide the kind of advance notice that will protect the putative loiterer from being ordered to disperse.  Such an order cannot retroactively give adequate warning of the boundary between the permissible and the impermissible applications of the law.[30]

Second, the terms of the dispersal order compound the inadequacy of the notice afforded by the ordinance.  It provides that the officer "shall order all such persons to disperse and remove themselves from the area."  App. to Pet. for Cert. 61a.  This vague phrasing raises a host of questions.  After such an order issues, how long must the loiterers remain apart?  How far must they move?  If each loiterer walks around the block and they meet again at the same location, are they subject to arrest or merely to being ordered to disperse again?  As we do here, we have found vagueness in a criminal statute exacerbated by the use of the standards of "neighborhood" and "locality."  *Connally* v. *General Constr. Co.*, 269 U. S. 385 (1926).  We remarked in *Connally* that "[b]oth terms are elastic and, dependent upon circumstances, may be equally satisfied by areas measured by rods or by miles."  *Id.*, at 395.

Lack of clarity in the description of the loiterer's duty to obey a dispersal order might not render the ordinance uncon-

---

[29] "Literally read . . . this ordinance says that a person may stand on a public sidewalk in Birmingham only at the whim of any police officer of that city.  The constitutional vice of so broad a provision needs no demonstration."  382 U. S., at 90.

[30] As we have noted in a similar context: "If petitioners were held guilty of violating the Georgia statute because they disobeyed the officers, this case falls within the rule that a generally worded statute which is construed to punish conduct which cannot constitutionally be punished is unconstitutionally vague to the extent that it fails to give adequate warning of the boundary between the constitutionally permissible and constitutionally impermissible applications of the statute."  *Wright* v. *Georgia*, 373 U. S. 284, 292 (1963).

stitutionally vague if the definition of the forbidden conduct were clear, but it does buttress our conclusion that the entire ordinance fails to give the ordinary citizen adequate notice of what is forbidden and what is permitted. The Constitution does not permit a legislature to "set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large." *United States* v. *Reese*, 92 U. S. 214, 221 (1876). This ordinance is therefore vague "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Coates* v. *Cincinnati*, 402 U. S. 611, 614 (1971).

## V

The broad sweep of the ordinance also violates "'the requirement that a legislature establish minimal guidelines to govern law enforcement.'" *Kolender* v. *Lawson*, 461 U. S., at 358. There are no such guidelines in the ordinance. In any public place in the city of Chicago, persons who stand or sit in the company of a gang member may be ordered to disperse unless their purpose is apparent. The mandatory language in the enactment directs the police to issue an order without first making any inquiry about their possible purposes. It matters not whether the reason that a gang member and his father, for example, might loiter near Wrigley Field is to rob an unsuspecting fan or just to get a glimpse of Sammy Sosa leaving the ballpark; in either event, if their purpose is not apparent to a nearby police officer, she may—indeed, she "shall"—order them to disperse.

Recognizing that the ordinance does reach a substantial amount of innocent conduct, we turn, then, to its language to determine if it "necessarily entrusts lawmaking to the moment-to-moment judgment of the policeman on his beat." *Kolender* v. *Lawson*, 461 U. S., at 360 (internal quotation marks omitted). As we discussed in the context of fair no-

tice, see *supra*, at 56–60, the principal source of the vast discretion conferred on the police in this case is the definition of loitering as "to remain in any one place with no apparent purpose."

As the Illinois Supreme Court interprets that definition, it "provides absolute discretion to police officers to decide what activities constitute loitering." 177 Ill. 2d, at 457, 687 N. E. 2d, at 63. We have no authority to construe the language of a state statute more narrowly than the construction given by that State's highest court.[31] "The power to determine the meaning of a statute carries with it the power to prescribe its extent and limitations as well as the method by which they shall be determined." *Smiley* v. *Kansas,* 196 U. S. 447, 455 (1905).

Nevertheless, the city disputes the Illinois Supreme Court's interpretation, arguing that the text of the ordinance limits the officer's discretion in three ways. First, it does not permit the officer to issue a dispersal order to anyone who is moving along or who has an apparent purpose. Second, it does not permit an arrest if individuals obey a dispersal order. Third, no order can issue unless the officer reasonably believes that one of the loiterers is a member of a criminal street gang.

Even putting to one side our duty to defer to a state court's construction of the scope of a local enactment, we find each of these limitations insufficient. That the ordinance does not apply to people who are moving—that is, to activity that would not constitute loitering under any possible definition of the term—does not even address the question of how much discretion the police enjoy in deciding which stationary per-

---

[31] This critical fact distinguishes this case from *Boos* v. *Barry,* 485 U. S. 312, 329–330 (1988). There, we noted that the text of the relevant statute, read literally, may have been void for vagueness both on notice and on discretionary enforcement grounds. We then found, however, that the Court of Appeals had "provided a narrowing construction that alleviates both of these difficulties." *Ibid.*

sons to disperse under the ordinance.[32]  Similarly, that the ordinance does not permit an arrest until after a dispersal order has been disobeyed does not provide any guidance to the officer deciding whether such an order should issue. The "no apparent purpose" standard for making that decision is inherently subjective because its application depends on whether some purpose is "apparent" to the officer on the scene.

Presumably an officer would have discretion to treat some purposes—perhaps a purpose to engage in idle conversation or simply to enjoy a cool breeze on a warm evening—as too frivolous to be apparent if he suspected a different ulterior motive.  Moreover, an officer conscious of the city council's reasons for enacting the ordinance might well ignore its text and issue a dispersal order, even though an illicit purpose is actually apparent.

It is true, as the city argues, that the requirement that the officer reasonably believe that a group of loiterers contains a gang member does place a limit on the authority to order dispersal.  That limitation would no doubt be sufficient if the ordinance only applied to loitering that had an apparently harmful purpose or effect,[33] or possibly if it only applied to loitering by persons reasonably believed to be criminal gang members.  But this ordinance, for reasons that are not explained in the findings of the city council, requires no harmful purpose and applies to nongang members as well as suspected gang members.[34]  It applies to everyone in the city

---

[32] It is possible to read the mandatory language of the ordinance and conclude that it affords the police *no* discretion, since it speaks with the mandatory "shall."  However, not even the city makes this argument, which flies in the face of common sense that all police officers must use some discretion in deciding when and where to enforce city ordinances.

[33] JUSTICE THOMAS' dissent overlooks the important distinction between this ordinance and those that authorize the police "to order groups of individuals who threaten the public peace to disperse."  See *post,* at 107.

[34] Not all of the respondents in this case, for example, are gang members. The city admits that it was unable to prove that Morales is a gang member but justifies his arrest and conviction by the fact that Morales admitted

who may remain in one place with one suspected gang member as long as their purpose is not apparent to an officer observing them. Friends, relatives, teachers, counselors, or even total strangers might unwittingly engage in forbidden loitering if they happen to engage in idle conversation with a gang member.

Ironically, the definition of loitering in the Chicago ordinance not only extends its scope to encompass harmless conduct, but also has the perverse consequence of excluding from its coverage much of the intimidating conduct that motivated its enactment. As the city council's findings demonstrate, the most harmful gang loitering is motivated either by an apparent purpose to publicize the gang's dominance of certain territory, thereby intimidating nonmembers, or by an equally apparent purpose to conceal ongoing commerce in illegal drugs. As the Illinois Supreme Court has not placed any limiting construction on the language in the ordinance, we must assume that the ordinance means what it says and that it has no application to loiterers whose purpose is apparent. The relative importance of its application to harmless loitering is magnified by its inapplicability to loitering that has an obviously threatening or illicit purpose.

Finally, in its opinion striking down the ordinance, the Illinois Supreme Court refused to accept the general order issued by the police department as a sufficient limitation on the "vast amount of discretion" granted to the police in its enforcement. We agree. See *Smith* v. *Goguen*, 415 U. S. 566, 575 (1974). That the police have adopted internal rules limiting their enforcement to certain designated areas in the city would not provide a defense to a loiterer who might be arrested elsewhere. Nor could a person who knowingly loitered with a well-known gang member anywhere in the city

---

"that he knew he was with criminal street gang members." Reply Brief for Petitioner 23, n. 14. In fact, 34 of the 66 respondents in this case were charged in a document that only accused them of being in the presence of a gang member. Tr. of Oral Arg. 34, 58.

safely assume that they would not be ordered to disperse no matter how innocent and harmless their loitering might be.

## VI

In our judgment, the Illinois Supreme Court correctly concluded that the ordinance does not provide sufficiently specific limits on the enforcement discretion of the police "to meet constitutional standards for definiteness and clarity."[35] 177 Ill. 2d, at 459, 687 N. E. 2d, at 64. We recognize the serious and difficult problems testified to by the citizens of Chicago that led to the enactment of this ordinance. "We are mindful that the preservation of liberty depends in part on the maintenance of social order." *Houston* v. *Hill*, 482 U. S. 451, 471–472 (1987). However, in this instance the city has enacted an ordinance that affords too much discretion to the police and too little notice to citizens who wish to use the public streets.

Accordingly, the judgment of the Supreme Court of Illinois is

*Affirmed.*

JUSTICE O'CONNOR, with whom JUSTICE BREYER joins, concurring in part and concurring in the judgment.

I agree with the Court that Chicago's Gang Congregation Ordinance, Chicago Municipal Code § 8–4–015 (1992) (gang loitering ordinance or ordinance) is unconstitutionally vague. A penal law is void for vagueness if it fails to "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited" or fails to

---

[35] This conclusion makes it unnecessary to reach the question whether the Illinois Supreme Court correctly decided that the ordinance is invalid as a deprivation of substantive due process. For this reason, JUSTICE THOMAS, see *post*, at 102–106, and JUSTICE SCALIA, see *post*, at 85–86, are mistaken when they assert that our decision must be analyzed under the framework for substantive due process set out in *Washington* v. *Glucksberg*, 521 U. S. 702 (1997).

establish guidelines to prevent "arbitrary and discriminatory enforcement" of the law. *Kolender* v. *Lawson,* 461 U. S. 352, 357 (1983). Of these, "the more important aspect of the vagueness doctrine 'is . . . the requirement that a legislature establish minimal guidelines to govern law enforcement.'" *Id.,* at 358 (quoting *Smith* v. *Goguen,* 415 U. S. 566, 574–575 (1974)). I share JUSTICE THOMAS' concern about the consequences of gang violence, and I agree that some degree of police discretion is necessary to allow the police "to perform their peacekeeping responsibilities satisfactorily." *Post,* at 109 (dissenting opinion). A criminal law, however, must not permit policemen, prosecutors, and juries to conduct "'a standardless sweep . . . to pursue their personal predilections.'" *Kolender* v. *Lawson, supra,* at 358 (quoting *Smith* v. *Goguen, supra,* at 575).

The ordinance at issue provides:

> "Whenever a police officer observes a person whom he reasonably believes to be a criminal street gang member loitering in any public place with one or more other persons, he shall order all such persons to disperse and remove themselves from the area. Any person who does not promptly obey such an order is in violation of this section." App. to Pet. for Cert. 61a.

To "[l]oiter," in turn, is defined in the ordinance as "to remain in any one place with no apparent purpose." *Ibid.* The Illinois Supreme Court declined to adopt a limiting construction of the ordinance and concluded that the ordinance vested "*absolute* discretion to police officers." 177 Ill. 2d 440, 457, 687 N. E. 2d 53, 63 (1997) (emphasis added). This Court is bound by the Illinois Supreme Court's construction of the ordinance. See *Terminiello* v. *Chicago,* 337 U. S. 1, 4 (1949).

As it has been construed by the Illinois court, Chicago's gang loitering ordinance is unconstitutionally vague because it lacks sufficient minimal standards to guide law enforce-

ment officers. In particular, it fails to provide police with any standard by which they can judge whether an individual has an *"apparent* purpose." Indeed, because any person standing on the street has a general "purpose"—even if it is simply to stand—the ordinance permits police officers to choose which purposes are *permissible.* Under this construction the police do not have to decide that an individual is "threaten[ing] the public peace" to issue a dispersal order. See *post,* at 107 (THOMAS, J., dissenting). Any police officer in Chicago is free, under the Illinois Supreme Court's construction of the ordinance, to order at his whim any person standing in a public place with a suspected gang member to disperse. Further, as construed by the Illinois court, the ordinance applies to hundreds of thousands of persons who are *not* gang members, standing on any sidewalk or in any park, coffee shop, bar, or "other location open to the public, whether publicly or privately owned." Chicago Municipal Code § 8–4–015(c)(5) (1992).

To be sure, there is no violation of the ordinance unless a person fails to obey promptly the order to disperse. But, a police officer cannot issue a dispersal order until he decides that a person is remaining in one place "with no apparent purpose," and the ordinance provides no guidance to the officer on how to make this antecedent decision. Moreover, the requirement that police issue dispersal orders only when they "reasonably believ[e]" that a group of loiterers includes a gang member fails to cure the ordinance's vague aspects. If the ordinance applied only to persons reasonably believed to be gang members, this requirement might have cured the ordinance's vagueness because it would have directed the manner in which the order was issued by specifying to whom the order could be issued. Cf. *ante,* at 62. But, the Illinois Supreme Court did not construe the ordinance to be so limited. See 177 Ill. 2d, at 453–454, 687 N. E. 2d, at 62.

This vagueness consideration alone provides a sufficient ground for affirming the Illinois court's decision, and I agree

with Part V of the Court's opinion, which discusses this consideration. See *ante*, at 62 ("[T]hat the ordinance does not permit an arrest until after a dispersal order has been disobeyed does not provide any guidance to the officer deciding whether such an order should issue"); *ibid.* ("It is true . . . that the requirement that the officer reasonably believe that a group of loiterers contains a gang member does place a limit on the authority to order dispersal. That limitation would no doubt be sufficient if the ordinance only applied to loitering that had an apparently harmful purpose or effect, or possibly if it only applied to loitering by persons reasonably believed to be criminal gang members"). Accordingly, there is no need to consider the other issues briefed by the parties and addressed by the plurality. I express no opinion about them.

It is important to courts and legislatures alike that we characterize more clearly the narrow scope of today's holding. As the ordinance comes to this Court, it is unconstitutionally vague. Nevertheless, there remain open to Chicago reasonable alternatives to combat the very real threat posed by gang intimidation and violence. For example, the Court properly and expressly distinguishes the ordinance from laws that require loiterers to have a "harmful purpose," see *ibid.*, from laws that target only gang members, see *ibid.*, and from laws that incorporate limits on the area and manner in which the laws may be enforced, see *ante*, at 62–63. In addition, the ordinance here is unlike a law that "directly prohibit[s]" the "'presence of a large collection of obviously brazen, insistent, and lawless gang members and hangers-on on the public ways,'" that "'intimidates residents.'" *Ante*, at 51, 52 (quoting Brief for Petitioner 14). Indeed, as the plurality notes, the city of Chicago has several laws that do exactly this. See *ante*, at 52, n. 17. Chicago has even enacted a provision that "enables police officers to fulfill . . . their traditional functions," including "preserving the public peace." See *post*, at 106 (THOMAS, J., dissenting). Specifi-

cally, Chicago's general disorderly conduct provision allows the police to arrest those who knowingly "provoke, make or aid in making a breach of peace." See Chicago Municipal Code § 8–4–010 (1992).

In my view, the gang loitering ordinance could have been construed more narrowly. The term "loiter" might possibly be construed in a more limited fashion to mean "to remain in any one place with no apparent purpose other than to establish control over identifiable areas, to intimidate others from entering those areas, or to conceal illegal activities." Such a definition would be consistent with the Chicago City Council's findings and would avoid the vagueness problems of the ordinance as construed by the Illinois Supreme Court. See App. to Pet. for Cert. 60a–61a. As noted above, so would limitations that restricted the ordinance's criminal penalties to gang members or that more carefully delineated the circumstances in which those penalties would apply to nongang members.

The Illinois Supreme Court did not choose to give a limiting construction to Chicago's ordinance. To the extent it relied on our precedents, particularly *Papachristou* v. *Jacksonville*, 405 U. S. 156 (1972), as *requiring* it to hold the ordinance vague in all of its applications because it was intentionally drafted in a vague manner, the Illinois court misapplied our precedents. See 177 Ill. 2d, at 458–459, 687 N. E. 2d, at 64. This Court has never held that the intent of the drafters determines whether a law is vague. Nevertheless, we cannot impose a limiting construction that a state supreme court has declined to adopt. See *Kolender* v. *Lawson*, 461 U. S., at 355–356, n. 4 (noting that the Court has held that " '[f]or the purpose of determining whether a state statute is too vague and indefinite to constitute valid legislation we must take the statute as though it read precisely as the highest court of the State has interpreted it' " (citations and internal quotation marks omitted)); *New York*

v. *Ferber*, 458 U. S. 747, 769, n. 24 (1982) (noting that where the Court is "dealing with a state statute on direct review of a state-court decision that has construed the statute[,] [s]uch a construction is binding on us"). Accordingly, I join Parts I, II, and V of the Court's opinion and concur in the judgment.

JUSTICE KENNEDY, concurring in part and concurring in the judgment.

I join Parts I, II, and V of the Court's opinion and concur in the judgment.

I also share many of the concerns JUSTICE STEVENS expresses in Part IV with respect to the sufficiency of notice under the ordinance. As interpreted by the Illinois Supreme Court, the Chicago ordinance would reach a broad range of innocent conduct. For this reason it is not necessarily saved by the requirement that the citizen must disobey a police order to disperse before there is a violation.

We have not often examined these types of orders. Cf. *Shuttlesworth* v. *Birmingham*, 382 U. S. 87 (1965). It can be assumed, however, that some police commands will subject a citizen to prosecution for disobeying whether or not the citizen knows why the order is given. Illustrative examples include when the police tell a pedestrian not to enter a building and the reason is to avoid impeding a rescue team, or to protect a crime scene, or to secure an area for the protection of a public official. It does not follow, however, that any unexplained police order must be obeyed without notice of the lawfulness of the order. The predicate of an order to disperse is not, in my view, sufficient to eliminate doubts regarding the adequacy of notice under this ordinance. A citizen, while engaging in a wide array of innocent conduct, is not likely to know when he may be subject to a dispersal order based on the officer's own knowledge of the identity or affiliations of other persons with whom the citizen is con-

gregating; nor may the citizen be able to assess what an officer might conceive to be the citizen's lack of an apparent purpose.

JUSTICE BREYER, concurring in part and concurring in the judgment.

The ordinance before us creates more than a *"minor* limitation upon the free state of nature." *Post,* at 74 (SCALIA, J., dissenting) (emphasis added). The law authorizes a police officer to order any person to remove himself from any "location open to the public, whether publicly or privately owned," Chicago Municipal Code § 8–4–015(c)(5) (1992), *i. e.,* any sidewalk, front stoop, public park, public square, lakeside promenade, hotel, restaurant, bowling alley, bar, barbershop, sports arena, shopping mall, etc., but with two, and only two, limitations: First, that person must be accompanied by (or must himself be) someone police reasonably believe is a gang member. Second, that person must have remained in that public place "with no apparent purpose." § 8–4–015(c)(1).

The first limitation cannot save the ordinance. Though it limits the number of persons subject to the law, it leaves many individuals, gang members and nongang members alike, subject to its strictures. Nor does it limit in any way the range of conduct that police may prohibit. The second limitation is, as the Court, *ante,* at 62, and JUSTICE O'CONNOR, *ante,* at 65–66 (opinion concurring in part and concurring in judgment), point out, not a limitation at all. Since one always has some apparent purpose, the so-called limitation invites, in fact requires, the policeman to interpret the words "no apparent purpose" as meaning "no apparent purpose except for . . . ." And it is in the ordinance's delegation to the policeman of open-ended discretion to fill in that blank that the problem lies. To grant to a policeman virtually standardless discretion to close off major portions of the city to an innocent person is, in my view, to create a major, not a "minor," "limitation upon the free state of nature."

Nor does it violate "our rules governing facial challenges," *post*, at 74 (SCALIA, J., dissenting), to forbid the city to apply the unconstitutional ordinance in this case. The reason *why* the ordinance is invalid explains how that is so. As I have said, I believe the ordinance violates the Constitution because it delegates too much discretion to a police officer to decide whom to order to move on, and in what circumstances. And I see no way to distinguish in the ordinance's terms between one application of that discretion and another. The ordinance is unconstitutional, not because a policeman applied this discretion wisely or poorly in a particular case, but rather because the policeman enjoys too much discretion in *every* case. And if every application of the ordinance represents an exercise of unlimited discretion, then the ordinance is invalid in all its applications. The city of Chicago may be able validly to apply some *other* law to the defendants in light of their conduct. But the city of Chicago may no more apply *this* law to the defendants, no matter how they behaved, than it could apply an (imaginary) statute that said, "It is a crime to do wrong," even to the worst of murderers. See *Lanzetta* v. *New Jersey*, 306 U. S. 451, 453 (1939) ("If on its face the challenged provision is repugnant to the due process clause, specification of details of the offense intended to be charged would not serve to validate it").

JUSTICE SCALIA's examples, *post*, at 81–83, reach a different conclusion because they assume a different basis for the law's constitutional invalidity. A statute, for example, might not provide fair warning to many, but an individual defendant might still have been aware that it prohibited the conduct in which he engaged. Cf., *e. g.*, *Parker* v. *Levy*, 417 U. S. 733, 756 (1974) ("[O]ne who has received fair warning of the criminality of his own conduct from the statute in question is [not] entitled to attack it because the language would not give similar fair warning with respect to other conduct which might be within its broad and literal ambit.

One to whose conduct a statute clearly applies may not successfully challenge it for vagueness"). But I believe this ordinance is unconstitutional, not because it provides insufficient notice, but because it does not provide "sufficient minimal standards to guide law enforcement officers." See *ante*, at 65–66 (O'CONNOR, J., concurring in part and concurring in judgment).

I concede that this case is unlike those First Amendment "overbreadth" cases in which this Court has permitted a facial challenge. In an overbreadth case, a defendant whose conduct clearly falls within the law and may be constitutionally prohibited can nonetheless have the law declared facially invalid to protect the rights of others (whose protected speech might otherwise be chilled). In the present case, the right that the defendants assert, the right to be free from the officer's exercise of unchecked discretion, is more clearly their own.

This case resembles *Coates* v. *Cincinnati*, 402 U. S. 611 (1971), where this Court declared facially unconstitutional on, among other grounds, the due process standard of vagueness an ordinance that prohibited persons assembled on a sidewalk from "conduct[ing] themselves in a manner annoying to persons passing by." The Court explained:

> "It is said that the ordinance is broad enough to encompass many types of conduct clearly within the city's constitutional power to prohibit. And so, indeed, it is. The city is free to prevent people from blocking sidewalks, obstructing traffic, littering streets, committing assaults, or engaging in countless other forms of antisocial conduct. It can do so through the enactment and enforcement of ordinances directed with reasonable specificity toward the conduct to be prohibited. . . . It cannot constitutionally do so through the enactment and enforcement of an ordinance whose violation may entirely depend upon whether or not a policeman is annoyed." *Id.*, at 614 (citation omitted).

The ordinance in *Coates* could not constitutionally be applied whether or not the conduct of the particular defendants was indisputably "annoying" or of a sort that a different, more specific ordinance could constitutionally prohibit. Similarly, here the city might have enacted a different ordinance, or the Illinois Supreme Court might have interpreted this ordinance differently. And the Constitution might well have permitted the city to apply that different ordinance (or this ordinance as interpreted differently) to circumstances like those present here. See *ante*, at 67–68 (O'CONNOR, J., concurring in part and concurring in judgment). But *this* ordinance, as I have said, cannot be constitutionally applied to anyone.

JUSTICE SCALIA, dissenting.

The citizens of Chicago were once free to drive about the city at whatever speed they wished. At some point Chicagoans (or perhaps Illinoisans) decided this would not do, and imposed prophylactic speed limits designed to assure safe operation by the average (or perhaps even subaverage) driver with the average (or perhaps even subaverage) vehicle. This infringed upon the "freedom" of all citizens, but was not unconstitutional.

Similarly, the citizens of Chicago were once free to stand around and gawk at the scene of an accident. At some point Chicagoans discovered that this obstructed traffic and caused more accidents. They did not make the practice unlawful, but they did authorize police officers to order the crowd to disperse, and imposed penalties for refusal to obey such an order. Again, this prophylactic measure infringed upon the "freedom" of all citizens, but was not unconstitutional.

Until the ordinance that is before us today was adopted, the citizens of Chicago were free to stand about in public places with no apparent purpose—to engage, that is, in conduct that appeared to be loitering. In recent years, however, the city has been afflicted with criminal street gangs. As reflected in the record before us, these gangs congregated

in public places to deal in drugs, and to terrorize the neighborhoods by demonstrating control over their "turf." Many residents of the inner city felt that they were prisoners in their own homes. Once again, Chicagoans decided that to eliminate the problem it was worth restricting some of the freedom that they once enjoyed. The means they took was similar to the second, and more mild, example given above rather than the first: Loitering was not made unlawful, but when a group of people occupied a public place without an apparent purpose and in the company of a known gang member, police officers were authorized to order them to disperse, and the failure to obey such an order was made unlawful. See Chicago Municipal Code § 8–4–015 (1992). The minor limitation upon the free state of nature that this prophylactic arrangement imposed upon all Chicagoans seemed to them (and it seems to me) a small price to pay for liberation of their streets.

The majority today invalidates this perfectly reasonable measure by ignoring our rules governing facial challenges, by elevating loitering to a constitutionally guaranteed right, and by discerning vagueness where, according to our usual standards, none exists.

I

Respondents' consolidated appeal presents a facial challenge to the Chicago ordinance on vagueness grounds. When a facial challenge is successful, the law in question is declared to be unenforceable in *all* its applications, and not just in its particular application to the party in suit. To tell the truth, it is highly questionable whether federal courts have any business making such a declaration. The rationale for our power to review federal legislation for constitutionality, expressed in *Marbury* v. *Madison,* 1 Cranch 137 (1803), was that we *had* to do so in order to decide the case before us. But that rationale only extends so far as to require us to determine that the statute is unconstitutional as applied to *this* party, in the circumstances of *this* case.

That limitation was fully grasped by Tocqueville, in his famous chapter on the power of the judiciary in American society:

> "The second characteristic of judicial power is, that it pronounces on special cases, and not upon general principles. If a judge, in deciding a particular point, destroys a general principle by passing a judgment which tends to reject all the inferences from that principle, and consequently to annul it, he remains within the ordinary limits of his functions. But if he directly attacks a general principle without having a particular case in view, he leaves the circle in which all nations have agreed to confine his authority; he assumes a more important, and perhaps a more useful influence, than that of the magistrate; but he ceases to represent the judicial power.
>
> .        .        .        .        .
>
> "Whenever a law which the judge holds to be unconstitutional is invoked in a tribunal of the United States, he may refuse to admit it as a rule .... But as soon as a judge has refused to apply any given law in a case, that law immediately loses a portion of its moral force. Those to whom it is prejudicial learn that means exist of overcoming its authority; and similar suits are multiplied, until it becomes powerless.... The political power which the Americans have intrusted to their courts of justice is therefore immense; but the evils of this power are considerably diminished by the impossibility of attacking the laws except through the courts of justice.... [W]hen a judge contests a law in an obscure debate on some particular case, the importance of his attack is concealed from public notice; his decision bears upon the interest of an individual, and the law is slighted only incidentally. Moreover, although it is censured, it is not abolished; its moral force may be diminished, but its authority is not taken away; and its final destruction can

be accomplished only by the reiterated attacks of judicial functionaries." Democracy in America 73, 75–76 (R. Heffner ed. 1956).

As Justice Sutherland described our system in his opinion for a unanimous Court in *Massachusetts* v. *Mellon*, 262 U. S. 447, 488 (1923):

"We have no power *per se* to review and annul acts of Congress on the ground that they are unconstitutional. That question may be considered only when the justification for some direct injury suffered or threatened, presenting a justiciable issue, is made to rest upon such an act. Then the power exercised is that of ascertaining and declaring the law applicable to the controversy. It amounts to little more than the negative power to disregard an unconstitutional enactment, which otherwise would stand in the way of the enforcement of a legal right. . . . If a case for preventive relief be presented the court enjoins, in effect, not the execution of the statute, but the acts of the official, the statute notwithstanding."

And as Justice Brennan described our system in his opinion for a unanimous Court in *United States* v. *Raines*, 362 U. S. 17, 20–22 (1960):

"The very foundation of the power of the federal courts to declare Acts of Congress unconstitutional lies in the power and duty of those courts to decide cases and controversies before them. . . . This Court, as is the case with all federal courts, 'has no jurisdiction to pronounce any statute, either of a State or of the United States, void, because irreconcilable with the Constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies. In the exercise of that jurisdiction, it is bound by two rules, to which it has rigidly adhered, one, never to anticipate a question of constitutional law in advance of the necessity of deciding it; the other never to formulate a rule of

constitutional law broader than is required by the precise facts to which it is to be applied.' . . . Kindred to these rules is the rule that one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional. . . . The delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases thus imagined."

It seems to me fundamentally incompatible with this system for the Court not to be content to find that a statute is unconstitutional as applied to the person before it, but to go further and pronounce that the statute is unconstitutional in *all* applications. Its reasoning may well suggest as much, but to pronounce a *holding* on that point seems to me no more than an advisory opinion—which a federal court should never issue at all, see *Hayburn's Case*, 2 Dall. 409 (1792), and *especially* should not issue with regard to a constitutional question, as to which we seek to avoid even *non*advisory opinions, see, *e. g., Ashwander* v. *TVA*, 297 U. S. 288, 347 (1936) (Brandeis, J., concurring). I think it quite improper, in short, to ask the constitutional claimant before us: Do you just want us to say that this statute cannot constitutionally be applied to you in this case, or do you want to go for broke and try to get the statute pronounced void in all its applications?

I must acknowledge, however, that for some of the present century we have done just this. But until recently, at least, we have—except in free-speech cases subject to the doctrine of overbreadth, see, *e. g., New York* v. *Ferber*, 458 U. S. 747, 769–773 (1982)—*required* the facial challenge to *be* a go-for-broke proposition. That is to say, before declaring a statute to be void in all its applications (something we should not be doing in the first place), we have at least imposed upon the litigant the eminently reasonable requirement that he estab-

lish that the statute was *unconstitutional* in all its applications. (I say that is an eminently reasonable requirement, not only because we should not be holding a statute void in all its applications unless it is unconstitutional in all its applications, but also because *unless* it is unconstitutional in all its applications we do not even know, without conducting an as-applied analysis, whether it is void with regard to the very litigant *before* us—whose case, after all, was the occasion for undertaking this inquiry in the first place.[1])

As we said in *United States* v. *Salerno,* 481 U. S. 739, 745 (1987):

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the *challenger must establish that no set of circum-*

---

[1] In other words, a facial attack, since it requires unconstitutionality in all circumstances, necessarily presumes that the litigant presently before the court would be able to sustain an as-applied challenge. See *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.,* 455 U. S. 489, 495 (1982) ("A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law"); *Parker* v. *Levy,* 417 U. S. 733, 756 (1974) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness").

The plurality asserts that in *United States* v. *Salerno,* 481 U. S. 739 (1987), which I discuss in text immediately following this footnote, the Court "entertained" a facial challenge even though "the defendants . . . did not claim that the statute was unconstitutional as applied to them." *Ante,* at 55, n. 22. That is not so. The Court made it absolutely clear in *Salerno* that a facial challenge requires the assertion that *"no set of circumstances exists* under which the Act would be valid," 481 U. S., at 745 (emphasis added). The footnoted statement upon which the plurality relies ("Nor have respondents claimed that the Act is unconstitutional because of the way it was applied to the particular facts of their case," *id.,* at 745, n. 3) was obviously meant to convey the fact that the defendants were not making, *in addition to their facial challenge,* an alternative as-applied challenge—*i. e.,* asserting that *even if* the statute was not unconstitutional in *all* its applications it was *at least* unconstitutional in its particular application to them.

*stances exists under which the Act would be valid.*
The fact that [a legislative Act] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment." (Emphasis added.)[2]

This proposition did not originate with *Salerno,* but had been expressed in a line of prior opinions. See, *e. g., Members of City Council of Los Angeles* v. *Taxpayers for Vincent,* 466 U. S. 789, 796 (1984) (opinion for the Court by STEVENS, J.) (statute not implicating First Amendment rights is invalid on its face if "it is unconstitutional in every conceivable application"); *Schall* v. *Martin,* 467 U. S. 253, 269, n. 18 (1984); *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.,* 455 U. S. 489, 494–495, 497 (1982); *United States* v. *National Dairy Products Corp.,* 372 U. S. 29, 31–32 (1963); *Raines,* 362 U. S., at 21. And the proposition has been reaffirmed in many cases and opinions since. See, *e. g., Anderson* v. *Edwards,* 514 U. S. 143, 155–156, n. 6 (1995) (unanimous Court); *Babbitt* v. *Sweet Home Chapter, Communities for Great Ore.,* 515 U. S. 687, 699 (1995) (opinion for the Court by STEVENS, J.) (facial challenge asserts that a challenged statute or regulation is invalid "in every circumstance"); *Reno* v. *Flores,* 507 U. S. 292, 301 (1993); *Rust* v. *Sullivan,*

---

[2] *Salerno,* a criminal case, repudiated the Court's statement in *Kolender* v. *Lawson,* 461 U. S. 352, 359, n. 8 (1983), to the effect that a facial challenge to a criminal statute could succeed "even when [the statute] could conceivably have had some valid application." *Kolender* seems to have confused the standard for First Amendment overbreadth challenges with the standard governing facial challenges on all other grounds. See *ibid.* (citing the Court's articulation of the standard for *First Amendment overbreadth* challenges from *Hoffman Estates, supra,* at 494). As *Salerno* noted, *supra,* at 745, the overbreadth doctrine is a specialized exception to the general rule for facial challenges, justified in light of the risk that an overbroad statute will chill free expression. See, *e. g., Broadrick* v. *Oklahoma,* 413 U. S. 601, 612 (1973).

500 U. S. 173, 183 (1991); *Ohio* v. *Akron Center for Reproductive Health,* 497 U. S. 502, 514 (1990) (opinion of KENNEDY, J.); *Webster* v. *Reproductive Health Servs.,* 492 U. S. 490, 523–524 (1989) (O'CONNOR, J., concurring in part and concurring in judgment); *New York State Club Assn., Inc.* v. *City of New York,* 487 U. S. 1, 11–12 (1988).[3] Unsurprisingly, given the clarity of our general jurisprudence on this point, the Federal Courts of Appeals *all* apply the *Salerno* standard in adjudicating facial challenges.[4]

---

[3] The plurality asserts that the *Salerno* standard for facial challenge "has never been the decisive factor in any decision of this Court." *Ante,* at 55, n. 22. It means by that only this: in rejecting a facial challenge, the Court has never contented itself with identifying *only one* situation in which the challenged statute would be constitutional, but has mentioned several. But that is not at all remarkable, and casts no doubt upon the validity of the principle that *Salerno* and these many other cases enunciated. It is difficult to conceive of a statute that would be constitutional in only a single application—and hard to resist mentioning more than one.

The plurality contends that it *does not matter* whether the *Salerno* standard is federal law, since facial challenge is a species of third-party standing, and federal limitations upon third-party standing do not apply in an appeal from a state decision which takes a broader view, as the Illinois Supreme Court's opinion did here. *Ante,* at 55–56, n. 22. This is quite wrong. Disagreement over the *Salerno* rule is not a disagreement over the "standing" question whether the person challenging the statute can *raise* the rights of third parties: under both *Salerno* and the plurality's rule he *can.* The disagreement relates to *how many* third-party rights he must *prove to be infringed* by the statute before he can *win: Salerno* says "all" (in addition to his own rights), the plurality says "many." That is not a question of standing but of substantive law. The notion that, if *Salerno* is the federal rule (a federal statute is not totally invalid unless it is invalid in all its applications), it can be *altered* by a state court (a federal statute is totally invalid if it is invalid in *many* of its applications), and that that alteration must be accepted by the Supreme Court of the United States is, to put it as gently as possible, remarkable.

[4] See, *e. g., Abdullah* v. *Commissioner of Ins. of Commonwealth of Mass.,* 84 F. 3d 18, 20 (CA1 1996); *Deshawn E.* v. *Safir,* 156 F. 3d 340, 347 (CA2 1998); *Artway* v. *Attorney Gen. of State of N. J.,* 81 F. 3d 1235, 1252, n. 13 (CA3 1996); *Manning* v. *Hunt,* 119 F. 3d 254, 268–269 (CA4 1997); *Causeway Medical Suite* v. *Ieyoub,* 109 F. 3d 1096, 1104 (CA5), cert. de-

I am aware, of course, that in some recent facial-challenge cases the Court has, without any attempt at explanation, created entirely irrational exceptions to the "unconstitutional in every conceivable application" rule, when the statutes at issue concerned hot-button social issues on which "informed opinion" was zealously united. See *Romer* v. *Evans*, 517 U. S. 620, 643 (1996) (SCALIA, J., dissenting) (homosexual rights); *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, 895 (1992) (abortion rights). But the present case does not even lend itself to such a "political correctness" exception—which, though illogical, is at least predictable. It is not *à la mode* to favor gang members and associated loiterers over the beleaguered law-abiding residents of the inner city.

When our normal criteria for facial challenges are applied, it is clear that the Justices in the majority have transposed the burden of proof. Instead of requiring respondents, who are challenging the ordinance, to show that it is invalid in all its applications, they have required petitioner to show that it is valid in all its applications. Both the plurality opinion and the concurrences display a lively imagination, creating hypothetical situations in which the law's application would (in their view) be ambiguous. But that creative role has been usurped from petitioner, who can defeat respondents' facial challenge by conjuring up *a single valid application* of the law. My contribution would go something like this:[5] Tony, a member of the Jets criminal street gang, is standing

---

nied, 522 U. S. 943 (1997); *Aronson* v. *Akron*, 116 F. 3d 804, 809 (CA6 1997); *Government Suppliers Consolidating Servs., Inc.* v. *Bayh*, 975 F. 2d 1267, 1283 (CA7 1992), cert. denied, 506 U. S. 1053 (1993); *Woodis* v. *Westark Community College*, 160 F. 3d 435, 438–439 (CA8 1998); *Roulette* v. *Seattle*, 97 F. 3d 300, 306 (CA9 1996); *Public Lands Council* v. *Babbitt*, 167 F. 3d 1287, 1293 (CA10 1999); *Dimmitt* v. *Clearwater*, 985 F. 2d 1565, 1570–1571 (CA11 1993); *Time Warner Entertainment Co.* v. *FCC*, 93 F. 3d 957, 972 (CADC 1996).

[5] With apologies for taking creative license with the work of Messrs. Bernstein, Sondheim, and Laurents. West Side Story, copyright 1959.

alongside and chatting with fellow gang members while staking out their turf at Promontory Point on the South Side of Chicago; the group is flashing gang signs and displaying their distinctive tattoos to passersby. Officer Krupke, applying the ordinance at issue here, orders the group to disperse. After some speculative discussion (probably irrelevant here) over whether the Jets are depraved because they are deprived, Tony and the other gang members break off further conversation with the statement—not entirely coherent, but evidently intended to be rude—"Gee, Officer Krupke, krup you." A tense standoff ensues until Officer Krupke arrests the group for failing to obey his dispersal order. Even assuming (as the Justices in the majority do, but I do not) that a law requiring obedience to a dispersal order is impermissibly vague unless it is clear to the objects of the order, before its issuance, that their conduct justifies it, I find it hard to believe that the Jets would not have known they had it coming. That should settle the matter of respondents' facial challenge to the ordinance's vagueness.

Of course respondents would still be able to claim that the ordinance was vague as applied to them. But the ultimate demonstration of the inappropriateness of the Court's holding of *facial* invalidity is the fact that it is doubtful whether some of these respondents could even sustain an *as-applied* challenge on the basis of the majority's own criteria. For instance, respondent Jose Renteria—who admitted that he was a member of the Satan Disciples gang—was observed by the arresting officer loitering on a street corner with other gang members. The officer issued a dispersal order, but when she returned to the same corner 15 to 20 minutes later, Renteria was still there with his friends, whereupon he was arrested. In another example, respondent Daniel Washington and several others—who admitted they were members of the Vice Lords gang—were observed by the arresting officer loitering in the street, yelling at passing vehicles, stopping traffic, and preventing pedestrians from using

the sidewalks. The arresting officer issued a dispersal order, issued *another* dispersal order later when the group did not move, and finally arrested the group when they were found loitering in the same place still later. Finally, respondent Gregorio Gutierrez—who had previously admitted to the arresting officer his membership in the Latin Kings gang—was observed loitering with two other men. The officer issued a dispersal order, drove around the block, and arrested the men after finding them in the same place upon his return. See Brief for Petitioner 7, n. 5; Brief for United States as *Amicus Curiae* 16, n. 11. Even on the majority's assumption that to avoid vagueness it must be clear to the object of the dispersal order *ex ante* that his conduct is covered by the ordinance, it seems most improbable that any of these as-applied challenges would be sustained. Much less is it possible to say that the ordinance is invalid in *all* its applications.

## II

The plurality's explanation for its departure from the usual rule governing facial challenges is seemingly contained in the following statement: "[This] is a criminal law that contains no *mens rea* requirement . . . *and* infringes on constitutionally protected rights . . . . When vagueness permeates the text of *such* a law, it is subject to facial attack." *Ante,* at 55 (emphasis added). The proposition is set forth with such assurance that one might suppose that it repeats some well-accepted formula in our jurisprudence: (Criminal law without *mens rea* requirement) + (infringement of constitutionally protected right) + (vagueness) = (entitlement to facial invalidation). There is no such formula; the plurality has made it up for this case, as the absence of any citation demonstrates.

But no matter. None of the three factors that the plurality relies upon exists anyway. I turn first to the support for the proposition that there is a constitutionally protected right to loiter—or, as the plurality more favorably describes

it, for a person to "remain in a public place of his choice." *Ante*, at 54. The plurality thinks much of this Fundamental Freedom to Loiter, which it contrasts with such lesser, constitutionally *un*protected, activities as doing (ugh!) *business:* "This is not an ordinance that simply regulates business behavior and contains a scienter requirement. . . . It is a criminal law that contains no *mens rea* requirement . . . and infringes on constitutionally protected rights." *Ante*, at 55 (internal quotation marks omitted). (Poor Alexander Hamilton, who has seen his "commercial republic" devolve, in the eyes of the plurality, at least, into an "indolent republic," see The Federalist No. 6, p. 56; No. 11, pp. 84–91 (C. Rossiter ed. 1961).)

Of course every activity, even scratching one's head, can be called a "constitutional right" if one means by that term nothing more than the fact that the activity is covered (as all are) by the Equal Protection Clause, so that those who engage in it cannot be singled out without "rational basis." See *FCC* v. *Beach Communications, Inc.,* 508 U. S. 307, 313 (1993). But using the term in that sense utterly impoverishes our constitutional discourse. We would then need a *new* term for those activities—such as political speech or religious worship—that cannot be forbidden even *with* rational basis.

The plurality tosses around the term "constitutional right" in this renegade sense, because there is not the slightest evidence for the existence of a genuine constitutional right to loiter. JUSTICE THOMAS recounts the vast historical tradition of criminalizing the activity. *Post*, at 102–106 (dissenting opinion). It is simply not maintainable that the right to loiter would have been regarded as an essential attribute of liberty at the time of the framing or at the time of adoption of the Fourteenth Amendment. For the plurality, however, the historical practices of our people are nothing more than a speed bump on the road to the "right" result. Its opinion blithely proclaims: "Neither this history nor the scholarly

compendia in JUSTICE THOMAS' dissent, *[ibid.,]* persuades us that the right to engage in loitering that is entirely harmless in both purpose and effect is not a part of the liberty protected by the Due Process Clause." *Ante,* at 54, n. 20. The entire practice of using the Due Process Clause to add judicially favored rights to the limitations upon democracy set forth in the Bill of Rights (usually under the rubric of so-called "substantive due process") is in my view judicial usurpation. But we have, recently at least, sought to limit the damage by tethering the courts' "right-making" power to an objective criterion. In *Washington* v. *Glucksberg,* 521 U. S. 702, 720–721 (1997), we explained our "established method" of substantive due process analysis: carefully and narrowly describing the asserted right, and then examining whether that right is manifested in "[o]ur Nation's history, legal traditions, and practices." See also *Collins* v. *Harker Heights,* 503 U. S. 115, 125–126 (1992); *Michael H.* v. *Gerald D.,* 491 U. S. 110, 122–123 (1989); *Moore* v. *East Cleveland,* 431 U. S. 494, 502–503 (1977). The plurality opinion not only ignores this necessary limitation, but it leaps far beyond any substantive-due-process atrocity we have ever committed, by actually placing the burden of proof upon the defendant to establish that loitering is *not* a "fundamental liberty." It never does marshal any support *for* the proposition that loitering *is* a constitutional right, contenting itself with a (transparently inadequate) explanation of why the historical record of laws banning loitering does not positively *contradict* that proposition,[6] and the (transparently erroneous) assertion that the city of Chicago appears to have conceded the

---

[6] The plurality's explanation for ignoring these laws is that many of them carried severe penalties and, during the Reconstruction era, they had "harsh consequences on African-American women and children." *Ante,* at 54, n. 20. Those severe penalties and those harsh consequences are certainly regrettable, but they in no way lessen (indeed, the harshness of penalty tends to increase) the capacity of these laws to *prove* that loitering was never regarded as a fundamental liberty.

point.[7] It is enough for the Members of the plurality that "history . . . [fails to] persuad[e] us that the right to engage in loitering that is entirely harmless in both purpose and effect is *not* a part of the liberty protected by the Due Process Clause," *ante*, at 54, n. 20 (emphasis added); they apparently think it quite unnecessary for anything to persuade them that it *is*.[8]

It would be unfair, however, to criticize the plurality's failed attempt to establish that loitering is a constitutionally

---

[7] *Ante*, at 53, n. 19. The plurality bases its assertion of apparent concession upon a footnote in Part I of petitioner's brief which reads: "Of course, laws regulating social gatherings affect a liberty interest, and thus are subject to review under the rubric of substantive due process . . . . We address that doctrine in Part II below." Brief for Petitioner 21–22, n. 13. If a careless reader were inclined to confuse the term "social gatherings" in this passage with "loitering," his confusion would be eliminated by pursuing the reference to Part II of the brief, which says, in its introductory paragraph: "[A]s we explain below, substantive due process does not support the court's novel holding that the Constitution secures the right to stand still on the public way even when one is not engaged in speech, assembly, or other conduct that enjoys affirmative constitutional protection." *Id.*, at 39.

[8] The plurality says, *ante*, at 64, n. 35, that since it decides the case on the basis of *procedural* due process rather than *substantive* due process, I am mistaken in analyzing its opinion "under the framework for substantive due process set out in *Washington* v. *Glucksberg*." *Ibid*. But I am not analyzing it under that framework. I am simply assuming that when the plurality says (as an essential part of its reasoning) that "the right to loiter for innocent purposes is . . . a part of the liberty protected by the Due Process Clause" it does not believe that the same word ("liberty") means one thing for purposes of substantive due process and something else for purposes of procedural due process. There is no authority for that startling proposition. See *Board of Regents of State Colleges* v. *Roth*, 408 U. S. 564, 572–575 (1972) (rejecting procedural-due-process claim for lack of "liberty" interest, and citing substantive-due-process cases).

The plurality's opinion seeks to have it both ways, invoking the Fourteenth Amendment's august protection of "liberty" in defining the standard of certainty that it sets, but then, in identifying the conduct protected by that high standard, ignoring our extensive case law defining "liberty," and substituting, instead, all "harmless and innocent" conduct, *ante*, at 58.

protected right while saying nothing of the concurrences. The plurality at least makes an attempt. The concurrences, on the other hand, make no pretense at attaching their broad "vagueness invalidates" rule to a liberty interest. As far as appears from JUSTICE O'CONNOR's and JUSTICE BREYER's opinions, *no* police officer may issue *any* order, affecting *any* insignificant sort of citizen conduct (except, perhaps, an order addressed to the unprotected class of "gang members") unless the standards for the issuance of that order are precise. No modern urban society—and probably none since London got big enough to have sewers—could function under such a rule. There are innumerable reasons why it may be important for a constable to tell a pedestrian to "move on"—and even if it were possible to list in an ordinance all of the reasons that are known, many are simply unpredictable. Hence the (entirely reasonable) Rule of the city of New York which reads: "No person shall fail, neglect or refuse to comply with the lawful direction or command of any Police Officer, Urban Park Ranger, Parks Enforcement Patrol Officer or other [Parks and Recreation] Department employee, indicated verbally, by gesture or otherwise." 56 RCNY § 1–03(c)(1) (1996). It is one thing to uphold an "as-applied" challenge when a pedestrian disobeys such an order that is unreasonable—or even when a pedestrian asserting some true "liberty" interest (holding a political rally, for instance) disobeys such an order that is reasonable *but unexplained.* But to say that such a general ordinance permitting "lawful orders" is void *in all its applications* demands more than a safe and orderly society can reasonably deliver.

JUSTICE KENNEDY apparently recognizes this, since he acknowledges that "some police commands will subject a citizen to prosecution for disobeying whether or not the citizen knows why the order is given," including, for example, an order "tell[ing] a pedestrian not to enter a building" when the reason is "to avoid impeding a rescue team." *Ante,* at 69 (opinion concurring in part and concurring in judgment).

But his only explanation of why the present interference with the "right to loiter" does not fall within that permitted scope of action is as follows: "The predicate of an order to disperse is not, in my view, sufficient to eliminate doubts regarding the adequacy of notice under this ordinance." *Ibid.* I have not the slightest idea what this means. But I *do* understand that the followup explanatory sentence, showing how this principle invalidates the present ordinance, applies equally to the rescue-team example that JUSTICE KENNEDY thinks is constitutional—as is demonstrated by substituting for references to the facts of the present case (shown in italics) references to his rescue-team hypothetical (shown in brackets): "A citizen, while engaging in a wide array of innocent conduct, is not likely to know when he may be subject to a *dispersal order* [order not to enter a building] based on the officer's own knowledge of *the identity or affiliations of other persons with whom the citizen is congregating* [what is going on in the building]; nor may the citizen be able to assess what an officer might conceive to be *the citizen's lack of an apparent purpose* [the impeding of a rescue team]." *Ante,* at 69–70.

## III

I turn next to that element of the plurality's facial-challenge formula which consists of the proposition that this criminal ordinance contains no *mens rea* requirement. The first step in analyzing this proposition is to determine what the *actus reus,* to which that *mens rea* is supposed to be attached, consists of. The majority believes that loitering forms part of (indeed, the essence of) the offense, and must be proved if conviction is to be obtained. See *ante,* at 47, 50–51, 53–55, 57–59, 60–61, 62–63 (plurality and majority opinions); *ante,* at 65, 66, 68 (O'CONNOR, J., concurring in part and concurring in judgment); *ante,* at 69–70 (KENNEDY, J., concurring in part and concurring in judgment); *ante,* at 72–73 (BREYER, J., concurring in part and concurring in judgment). That is not what the ordinance provides. The

only part of the ordinance that refers to loitering is the portion that addresses, not the punishable conduct of the defendant, but what the police officer must observe before he can issue an order to disperse; and what he must observe is carefully defined in terms of what the defendant *appears* to be doing, not in terms of what the defendant is *actually* doing. The ordinance does not require that the defendant have been loitering (*i. e.*, have been remaining in one place with no purpose), but rather that the police officer have observed him remaining in one place without any *apparent* purpose. Someone who in fact *has* a genuine purpose for remaining where he is (waiting for a friend, for example, or waiting to hold up a bank) *can* be ordered to move on (assuming the other conditions of the ordinance are met), so long as his remaining has no *apparent* purpose. It is likely, to be sure, that the ordinance will come down most heavily upon those who are *actually* loitering (those who *really* have no purpose in remaining where they are); but that activity is not a condition for issuance of the dispersal order.

The *only* act of a defendant that is made punishable by the ordinance—or, indeed, that is even mentioned by the ordinance—is his failure to "promptly obey" an order to disperse. The question, then, is whether that *actus reus* must be accompanied by any wrongful intent—and of course it must. As the Court itself describes the requirement, "a person must *disobey* the officer's order." *Ante*, at 47 (emphasis added). No one thinks a defendant could be successfully prosecuted under the ordinance if he did not hear the order to disperse, or if he suffered a paralysis that rendered his compliance impossible. The willful failure to obey a police order is wrongful intent enough.

## IV

Finally, I address the last of the three factors in the plurality's facial-challenge formula: the proposition that the ordinance is vague. It is not. Even under the ersatz over-

breadth standard applied in *Kolender* v. *Lawson,* 461 U. S. 352, 358, n. 8 (1983), which allows facial challenges if a law reaches "a substantial amount of constitutionally protected conduct," respondents' claim fails because the ordinance would not be vague in most or even a substantial number of applications. A law is unconstitutionally vague if its lack of definitive standards either (1) fails to apprise persons of ordinary intelligence of the prohibited conduct, or (2) encourages arbitrary and discriminatory enforcement. See, *e. g., Grayned* v. *City of Rockford,* 408 U. S. 104, 108 (1972).

The plurality relies primarily upon the first of these aspects. Since, it reasons, "the loitering is the conduct that the ordinance is designed to prohibit," and "an officer may issue an order only after prohibited conduct has already occurred," *ante,* at 58, 59, the order to disperse cannot itself serve "to apprise persons of ordinary intelligence of the prohibited conduct." What counts for purposes of vagueness analysis, however, is not what the ordinance is "designed to prohibit," but what it actually subjects to criminal penalty. As discussed earlier, that consists of nothing but the refusal to obey a dispersal order, as to which there is no doubt of adequate notice of the prohibited conduct. The plurality's suggestion that even the dispersal order *itself* is unconstitutionally vague, because it does not specify *how far to disperse(!),* see *ante,* at 59, scarcely requires a response.[9] If it were true, it would render unconstitutional for vagueness many of the Presidential proclamations issued under that provision of the United States Code which requires the Pres-

---

[9] I call it a "suggestion" because the plurality says only that the terms of the dispersal order "compound the inadequacy of the notice," and acknowledges that they "might not render the ordinance unconstitutionally vague if the definition of the forbidden conduct were clear." *Ante,* at 59, 59–60. This notion that a prescription ("Disperse!") which is itself not unconstitutionally vague can somehow contribute to the unconstitutional vagueness of the entire scheme is full of mystery—suspending, as it does, the metaphysical principle that nothing can confer what it does not possess *(nemo dat qui non habet).*

ident, before using the militia or the Armed Forces for law enforcement, to issue a proclamation ordering the insurgents to disperse. See 10 U. S. C. § 334. President Eisenhower's proclamation relating to the obstruction of court-ordered enrollment of black students in public schools at Little Rock, Arkansas, read as follows: "I . . . command all persons engaged in such obstruction of justice to cease and desist therefrom, and to disperse forthwith." Presidential Proclamation No. 3204, 3 CFR 132 (1954–1958 Comp.). See also Presidential Proclamation No. 3645, 3 CFR 103 (1964–1965 Comp.) (ordering those obstructing the civil rights march from Selma to Montgomery, Alabama, to "disperse . . . forthwith"). See also *Boos* v. *Barry*, 485 U. S. 312, 331 (1988) (rejecting overbreadth/vagueness challenge to a law allowing police officers to order congregations near foreign embassies to disperse); *Cox* v. *Louisiana*, 379 U. S. 536, 551 (1965) (rejecting vagueness challenge to the dispersal-order prong of a breach-of-the-peace statute and describing that prong as "narrow and specific").

For its determination of unconstitutional vagueness, the Court relies secondarily—and JUSTICE O'CONNOR's and JUSTICE BREYER's concurrences exclusively—upon the second aspect of that doctrine, which requires sufficient specificity to prevent arbitrary and discriminatory law enforcement. See *ante*, at 60 (majority opinion); *ante*, at 65–66 (O'CONNOR, J., concurring in part and concurring in judgment); *ante*, at 72 (BREYER, J., concurring in part and concurring in judgment). In discussing whether Chicago's ordinance meets that requirement, the Justices in the majority hide behind an artificial construct of judicial restraint. They point to the Supreme Court of Illinois' statement that the "apparent purpose" standard "provides absolute discretion to police officers to decide what activities constitute loitering," 177 Ill. 2d 440, 457, 687 N. E. 2d 53, 63 (1997), and protest that it would be wrong to construe the language of the ordinance more narrowly than did the State's highest court. *Ante*, at

61, 63 (majority opinion); *ante*, at 68 (O'CONNOR, J., concurring in part and concurring in judgment). The "absolute discretion" statement, however, is nothing more than the Illinois Supreme Court's *characterization* of what the language achieved—after that court refused (as I do) to read in any limitations that the words do not fairly contain. It is not a construction of the language (to which we are bound) but a legal conclusion (to which we most assuredly are not bound).

The criteria for issuance of a dispersal order under the Chicago ordinance could hardly be clearer. First, the law requires police officers to "reasonably believ[e]" that one of the group to which the order is issued is a "criminal street gang member." This resembles a probable-cause standard, and the Chicago Police ·Department's General Order 92–4 (1992)—promulgated to govern enforcement of the ordinance—makes the probable-cause requirement explicit.[10] Under the Order, officers must have probable cause to believe that an individual is a member of a criminal street gang, to be substantiated by the officer's "experience and knowledge of the alleged offenders" and by "specific, documented and reliable information" such as reliable witness testimony or an individual's admission of gang membership or display of distinctive colors, tattoos, signs, or other markings worn by members of particular criminal street gangs. App. to Pet. for Cert. 67a–69a, 71a–72a.

Second, the ordinance requires that the group be "remain-[ing] in any one place with no apparent purpose." JUSTICE O'CONNOR's assertion that this applies to "any person stand-

_____

[10] "Administrative interpretation and implementation of a regulation are . . . highly relevant to our [vagueness] analysis, for '[i]n evaluating a facial challenge to a state law, a federal court must . . . consider any limiting construction that a state court or *enforcement agency* has proffered.'" *Ward* v. *Rock Against Racism*, 491 U. S. 781, 795–796 (1989) (emphasis added) (quoting *Hoffman Estates*, 455 U. S., at 494, n. 5). See also *id.*, at 504 (administrative regulations "will often suffice to clarify a standard with an otherwise uncertain scope").

ing in a public place," *ante,* at 66, is a distortion. The ordinance does not apply to "standing," but to "remain[ing]"—a term which in this context obviously means "[to] endure or persist," see American Heritage Dictionary 1525 (1992). There may be some ambiguity at the margin, but "remain[ing] in one place" requires more than a temporary stop, and is clear in most of its applications, including all of those represented by the facts surrounding respondents' arrests described *supra,* at 82–83.

As for the phrase "with no apparent purpose": JUSTICE O'CONNOR again distorts this adjectival phrase, by separating it from the word that it modifies. "[A]ny person standing on the street," her concurrence says, "has a general 'purpose'—even if it is simply to stand," and thus "the ordinance permits police officers to choose which purposes are *permissible.*" *Ante,* at 66. But Chicago police officers enforcing the ordinance are not looking for people with no apparent purpose (who are regrettably in oversupply); they are looking for people who "remain in any one place with no apparent purpose"—that is, who remain there without any apparent reason *for remaining there.* That is not difficult to perceive.[11]

The Court's attempt to demonstrate the vagueness of the ordinance produces the following peculiar statement: "The 'no apparent purpose' standard for making [the decision to

---

[11] JUSTICE BREYER asserts that "one always has some apparent purpose," so that the policeman must "interpret the words 'no apparent purpose' as meaning 'no apparent purpose except for . . . .'" *Ante,* at 70. It is simply not true that "one always has some apparent purpose"—and especially not true that one always has some apparent purpose in remaining at rest, for the simple reason that one often (indeed, perhaps usually) has no *actual* purpose in remaining at rest. Remaining at rest will be a person's normal state, unless he has a purpose which causes him to move. That is why one frequently reads of a person's "wandering aimlessly" (which is worthy of note) but not of a person's "sitting aimlessly" (which is not remarkable at all). And that is why a synonym for "purpose" is "motive": that which causes one *to move.*

issue an order to disperse] is inherently subjective because its application depends on whether some purpose is 'apparent' to the officer on the scene." *Ante,* at 62. In the Court's view, a person's lack of any purpose in staying in one location is presumably an *objective* factor, and what the ordinance requires as a condition of an order to disperse—the absence of any *apparent* purpose—is a *subjective* factor. This side of the looking glass, just the opposite is true.

Elsewhere, of course, the Court acknowledges the clear, objective commands of the ordinance, and indeed relies upon them to paint it as unfair:

> "In any public place in the city of Chicago, persons who stand or sit in the company of a gang member may be ordered to disperse unless their purpose is apparent. The mandatory language in the enactment directs the police to issue an order without first making any inquiry about their possible purposes. It matters not whether the reason that a gang member and his father, for example, might loiter near Wrigley Field is to rob an unsuspecting fan or just to get a glimpse of Sammy Sosa leaving the ballpark; in either event, if their purpose is not apparent to a nearby police officer, she may—indeed, she 'shall'—order them to disperse." *Ante,* at 60.

Quite so. And the fact that this clear instruction to the officers "reach[es] a substantial amount of innocent conduct," *ibid.,* would be invalidating if that conduct were constitutionally protected against abridgment, such as speech or the practice of religion. Remaining in one place is *not* so protected, and so (as already discussed) it is up to the citizens of Chicago—not us—to decide whether the tradeoff is worth it.[12]

---

[12] The Court speculates that a police officer may exercise his discretion to *enforce* the ordinance and *direct* dispersal when (in the Court's view) the ordinance is inapplicable—viz., where there *is* an apparent purpose, but it is an unlawful one. See *ante,* at 62. No one in his right mind

JUSTICE BREYER's concurrence tries to perform the impossible feat of affirming our unquestioned rule that a criminal statute that is so vague as to give constitutionally inadequate notice to *some* violators may nonetheless be enforced against those whose conduct is clearly covered, see *ante*, at 71–72, citing *Parker* v. *Levy*, 417 U. S. 733 (1974), while at the same time asserting that a statute which "delegates too much discretion to a police officer" is invalid in *all* its applications, even where the officer uses his discretion "wisely," *ante*, at 71.  But the vagueness that causes notice to be inadequate is the very same vagueness that causes "too much discretion" to be lodged in the enforcing officer.  Put another way: A law that gives the policeman clear guidance in all cases gives the public clear guidance in all cases as well. Thus, what JUSTICE BREYER gives with one hand, he takes away with the other.  In his view, vague statutes that nonetheless give adequate notice to *some* violators are not unenforceable against those violators because of inadequate notice, but *are* unenforceable against them "because the policeman enjoys too much discretion in *every* case," *ibid.* This is simply contrary to our case law, including *Parker* v. *Levy, supra.*[13]

---

would read the phrase "without any apparent purpose" to mean anything other than "without any apparent lawful purpose."  The implication that acts referred to approvingly in statutory language are "lawful" acts is routine.  The Court asserts that the Illinois Supreme Court has forced it into this interpretive inanity because, since it "has not placed any limiting construction on the language in the ordinance, we must assume that the ordinance means what it says . . . ."  *Ante*, at 63.  But the Illinois Supreme Court did not mention this particular interpretive issue, which has nothing to do with giving the ordinance a "limiting" interpretation, and everything to do with giving it its ordinary legal meaning.

[13] The opinion that JUSTICE BREYER relies on, *Coates* v. *Cincinnati*, 402 U. S. 611 (1971), discussed *ante*, at 72–73, did not say that the ordinance there at issue gave adequate notice but did not provide adequate standards for the police.  It invalidated that ordinance *on both inadequate-notice and inadequate-enforcement-standard grounds*, because First Amendment rights were implicated.  It is common ground, however, that

96

## V

The plurality points out that Chicago already has several laws that reach the intimidating and unlawful gang-related conduct the ordinance was directed at. See *ante*, at 52, n. 17. The problem, of course, well recognized by Chicago's city council, is that the gang members cease their intimidating and unlawful behavior under the watchful eye of police officers, but return to it as soon as the police drive away. The only solution, the council concluded, was to clear the streets of congregations of gangs, their drug customers, and their associates.

JUSTICE O'CONNOR's concurrence proffers the same empty solace of existing laws useless for the purpose at hand, see *ante*, at 67, 67–68, but seeks to be helpful by suggesting some measures *similar* to this ordinance that *would* be constitutional. It says that Chicago could, for example, enact a law that "directly prohibit[s] the presence of a large collection of obviously brazen, insistent, and lawless gang members and hangers-on on the public ways, that intimidates residents." *Ante*, at 67 (internal quotation marks omitted). (If the majority considers the present ordinance too vague, it would be fun to see what it makes of "a large collection of obviously brazen, insistent, and lawless gang members.") This prescription of the concurrence is largely a quotation from the plurality—which itself answers the concurrence's suggestion that such a law would be helpful by pointing out that the city already "has several laws that serve this purpose." *Ante*, at 52, n. 17 (plurality opinion) (citing extant laws against "intimidation," "streetgang criminal drug conspiracy," and "mob action"). The problem, again, is that the intimidation and lawlessness do not occur when the police are in sight.

-----

the present case does not implicate the First Amendment, see *ante*, at 52–53 (plurality opinion); *ante*, at 72 (BREYER, J., concurring in part and concurring in judgment).

JUSTICE O'CONNOR's concurrence also proffers another cure: "If the ordinance applied only to persons reasonably believed to be gang members, this requirement might have cured the ordinance's vagueness because it would have directed the manner in which the order was issued by specifying to whom the order could be issued." *Ante,* at 66 (the Court agrees that this might be a cure, see *ante,* at 62). But the ordinance already specifies to whom the order can be issued: persons remaining in one place with no apparent purpose in the company of a gang member. And if "remain[ing] in one place with no apparent purpose" is so vague as to give the police unbridled discretion in controlling the conduct of nongang members, it surpasses understanding how it ceases to be so vague when applied to gang members *alone.* Surely gang members cannot be decreed to be outlaws, subject to the merest whim of the police as the rest of us are not.

*    *    *

The fact is that the present ordinance is entirely clear in its application, cannot be violated except with full knowledge and intent, and vests no more discretion in the police than innumerable other measures authorizing police orders to preserve the public peace and safety. As suggested by their tortured analyses, and by their suggested solutions that bear no relation to the identified constitutional problem, the majority's real quarrel with the Chicago ordinance is simply that it permits (or indeed requires) too much harmless conduct by innocent citizens to be proscribed. As JUSTICE O'CONNOR's concurrence says with disapprobation, "the ordinance applies to hundreds of thousands of persons who are *not* gang members, standing on any sidewalk or in any park, coffee shop, bar, or other location open to the public." *Ante,* at 66 (internal quotation marks omitted).

But in our democratic system, how much harmless conduct to proscribe is not a judgment to be made by the courts. So long as constitutionally guaranteed rights are not affected,

and so long as the proscription has a rational basis, *all sorts* of perfectly harmless activity by millions of perfectly innocent people can be forbidden—riding a motorcycle without a safety helmet, for example, starting a campfire in a national forest, or selling a safe and effective drug not yet approved by the Food and Drug Administration. All of these acts are entirely innocent and harmless in themselves, but because of the *risk* of harm that they entail, the freedom to engage in them has been abridged. The citizens of Chicago have decided that depriving themselves of the freedom to "hang out" with a gang member is necessary to eliminate pervasive gang crime and intimidation—and that the elimination of the one is worth the deprivation of the other. This Court has no business second-guessing either the degree of necessity or the fairness of the trade.

I dissent from the judgment of the Court.

JUSTICE THOMAS, with whom THE CHIEF JUSTICE and JUSTICE SCALIA join, dissenting.

The duly elected members of the Chicago City Council enacted the ordinance at issue as part of a larger effort to prevent gangs from establishing dominion over the public streets. By invalidating Chicago's ordinance, I fear that the Court has unnecessarily sentenced law-abiding citizens to lives of terror and misery. The ordinance is not vague. "[A]ny fool would know that a particular category of conduct would be within [its] reach." *Kolender* v. *Lawson,* 461 U. S. 352, 370 (1983) (White, J., dissenting). Nor does it violate the Due Process Clause. The asserted "freedom to loiter for innocent purposes," *ante,* at 53 (plurality opinion), is in no way " 'deeply rooted in this Nation's history and tradition,' " *Washington* v. *Glucksberg,* 521 U. S. 702, 721 (1997) (citation omitted). I dissent.

I

The human costs exacted by criminal street gangs are inestimable. In many of our Nation's cities, gangs have "[v]ir-

tually overtak[en] certain neighborhoods, contributing to the economic and social decline of these areas and causing fear and lifestyle changes among law-abiding residents." U. S. Dept. of Justice, Office of Justice Programs, Bureau of Justice Assistance, Monograph: Urban Street Gang Enforcement 3 (1997). Gangs fill the daily lives of many of our poorest and most vulnerable citizens with a terror that the Court does not give sufficient consideration, often relegating them to the status of prisoners in their own homes. See U. S. Dept. of Justice, Attorney General's Report to the President, Coordinated Approach to the Challenge of Gang Violence: A Progress Report 1 (Apr. 1996) ("From the small business owner who is literally crippled because he refuses to pay 'protection' money to the neighborhood gang, to the families who are hostages within their homes, living in neighborhoods ruled by predatory drug trafficking gangs, the harmful impact of gang violence . . . is both physically and psychologically debilitating").

The city of Chicago has suffered the devastation wrought by this national tragedy. Last year, in an effort to curb plummeting attendance, the Chicago Public Schools hired dozens of adults to escort children to school. The youngsters had become too terrified of gang violence to leave their homes alone. Martinez, Parents Paid to Walk Line Between Gangs and School, Chicago Tribune, Jan. 21, 1998, p. 1. The children's fears were not unfounded. In 1996, the Chicago Police Department estimated that there were 132 criminal street gangs in the city. Illinois Criminal Justice Information Authority, Research Bulletin: Street Gangs and Crime 4 (Sept. 1996). Between 1987 and 1994, these gangs were involved in 63,141 criminal incidents, including 21,689 nonlethal violent crimes and 894 homicides. *Id.*, at 4–5.[1] Many

---

[1] In 1996 alone, gangs were involved in 225 homicides, which was 28 percent of the total homicides committed in the city. Chicago Police Department, Gang and Narcotic Related Violent Crime, City of Chicago: 1993–1997 (June 1998). Nationwide, law enforcement officials estimate

of these criminal incidents and homicides result from gang "turf battles," which take place on the public streets and place innocent residents in grave danger. See U. S. Dept. of Justice, Office of Justice Programs, National Institute of Justice, Research in brief, C. Block & R. Block, Street Gang Crime in Chicago 1 (Dec. 1993); U. S. Dept. of Justice, Office of Juvenile Justice and Delinquency Prevention, Juvenile Justice Journal, J. Howell, Youth Gang Drug Trafficking and Homicide: Policy and Program Implications (Dec. 1997); see also Testimony of Steven R. Wiley, Chief, Violent Crimes and Major Offenders Section, FBI, Hearing on S. 54 before the Senate Committee on the Judiciary, 105th Cong., 1st Sess., 13 (1997) ("While street gangs may specialize in entrepreneurial activities like drug-dealing, their gang-related lethal violence is more likely to grow out of turf conflicts").

Before enacting its ordinance, the Chicago City Council held extensive hearings on the problems of gang loitering. Concerned citizens appeared to testify poignantly as to how gangs disrupt their daily lives. Ordinary citizens like Ms. D'Ivory Gordon explained that she struggled just to walk to work:

"When I walk out my door, these guys are out there . . . .

"They watch you. . . . They know where you live. They know what time you leave, what time you come home. I am afraid of them. I have even come to the point now that I carry a meat cleaver to work with me . . . .

". . . I don't want to hurt anyone, and I don't want to be hurt. We need to clean these corners up. Clean these communities up and take it back from them." Transcript of Proceedings before the City Council of

that as many as 31,000 street gangs, with 846,000 members, exist. U. S. Dept. of Justice, Office of Justice Programs, Highlights of the 1996 National Youth Gang Survey (OJJDP Fact Sheet, No. 86, Nov. 1998).

Chicago, Committee on Police and Fire 66–67 (May 15, 1992) (hereinafter Transcript).

Eighty-eight-year-old Susan Mary Jackson echoed her sentiments, testifying: "We used to have a nice neighborhood. We don't have it anymore . . . . I am scared to go out in the daytime. . . . [Y]ou can't pass because they are standing. I am afraid to go to the store. I don't go to the store because I am afraid. At my age if they look at me real hard, I be ready to holler." *Id.*, at 93–95. Another long-time resident testified:

"I have never had the terror that I feel everyday when I walk down the streets of Chicago. . . .

.          .          .          .          .

"I have had my windows broken out. I have had guns pulled on me. I have been threatened. I get intimidated on a daily basis, and it's come to the point where I say, well, do I go out today. Do I put my ax in my briefcase. Do I walk around dressed like a bum so I am not looking rich or got any money or anything like that." *Id.*, at 124–125.

Following these hearings, the council found that "criminal street gangs establish control over identifiable areas . . . by loitering in those areas and intimidating others from entering those areas." App. to Pet. for Cert. 60a. It further found that the mere presence of gang members "intimidate[s] many law abiding citizens" and "creates a justifiable fear for the safety of persons and property in the area." *Ibid.* It is the product of this democratic process—the council's attempt to address these social ills—that we are asked to pass judgment upon today.

## II

As part of its ongoing effort to curb the deleterious effects of criminal street gangs, the citizens of Chicago sensibly decided to return to basics. The ordinance does nothing more than confirm the well-established principle that the police

have the duty and the power to maintain the public peace, and, when necessary, to disperse groups of individuals who threaten it. The plurality, however, concludes that the city's commonsense effort to combat gang loitering fails constitutional scrutiny for two separate reasons—because it infringes upon gang members' constitutional right to "loiter for innocent purposes," *ante*, at 53, and because it is vague on its face, *ante*, at 55. A majority of the Court endorses the latter conclusion. I respectfully disagree.

## A

We recently reconfirmed that "[o]ur Nation's history, legal traditions, and practices . . . provide the crucial 'guideposts for responsible decisionmaking' . . . that direct and restrain our exposition of the Due Process Clause." *Glucksberg*, 521 U. S., at 721 (quoting *Moore* v. *East Cleveland*, 431 U. S. 494, 503 (1977) (plurality opinion)). Only laws that infringe "those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition'" offend the Due Process Clause. *Glucksberg*, *supra*, at 720–721.

The plurality asserts that "the freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment." *Ante*, at 53. Yet it acknowledges—as it must—that "antiloitering ordinances have long existed in this country." *Ante*, at 53, n. 20; see also 177 Ill. 2d 440, 450, 687 N. E. 2d 53, 60 (1997) (case below) ("Loitering and vagrancy statutes have been utilized throughout American history in an attempt to prevent crime by removing 'undesirable persons' from public before they have the opportunity to engage in criminal activity"). In derogation of the framework we articulated only two Terms ago in *Glucksberg*, the plurality asserts that this history fails to "persuad[e] us that the right to engage in loitering that is entirely harmless . . . is not a part of the liberty protected by the Due Process Clause." *Ante*, at 54,

n. 20.   Apparently, the plurality believes it sufficient to rest on the proposition that antiloitering laws represent an anachronistic throwback to an earlier, less sophisticated, era.   For example, it expresses concern that some antivagrancy laws carried the penalty of slavery.   *Ibid.*   But this fact is irrelevant to our analysis of whether there is a constitutional right to loiter for innocent purposes.   This case does not involve an antiloitering law carrying the penalty of slavery.   The law at issue in this case criminalizes the failure to obey a police officer's order to disperse and imposes modest penalties, such as a fine of up to $500 and a prison sentence of up to six months.

The plurality's sweeping conclusion that this ordinance infringes upon a liberty interest protected by the Fourteenth Amendment's Due Process Clause withers when exposed to the relevant history: Laws prohibiting loitering and vagrancy have been a fixture of Anglo-American law at least since the time of the Norman Conquest.   See generally C. Ribton-Turner, A History of Vagrants and Vagrancy and Beggars and Begging (reprint 1972) (discussing history of English vagrancy laws); see also *Papachristou* v. *Jacksonville*, 405 U. S. 156, 161–162 (1972) (recounting history of vagrancy laws).   The American colonists enacted laws modeled upon the English vagrancy laws, and at the time of the founding, state and local governments customarily criminalized loitering and other forms of vagrancy.[2]   Vagrancy laws

---

[2] See, *e. g.,* Act for the Restraint of idle and disorderly Persons (1784) (reprinted in 2 First Laws of the State of North Carolina 508–509 (J. Cushing comp. 1984)); Act for restraining, correcting, suppressing and punishing Rogues, Vagabonds, common Beggars, and other lewd, idle, dissolute, profane and disorderly Persons; and for setting them to work (reprinted in First Laws of the State of Connecticut 206–210 (J. Cushing comp. 1982)); Act for suppressing and punishing of Rogues, Vagabonds, common Beggars and other idle, disorderly and lewd persons (1788) (reprinted in First Laws of the Commonwealth of Massachusetts 347–349 (J. Cushing comp. 1981)); Act for better securing the payment of levies and restraint of vagrants, and for making provisions for the poor (1776)

were common in the decades preceding the ratification of the Fourteenth Amendment,[3] and remained on the books long after.[4]

---

(reprinted in First Laws of the State of Virginia 44–45 (J. Cushing comp. 1982)); Act for the better ordering of the Police of the Town of Providence, of the Work-House in said Town (1796) (reprinted in 2 First Laws of the State of Rhode Island 362–367 (J. Cushing comp. 1983)); Act for the Promotion of Industry, and for the Suppression of Vagrants and Other Idle and Disorderly Persons (1787) (reprinted in First Laws of the State of South Carolina, Part 2, 431–433 (J. Cushing comp. 1981)); An act for the punishment of vagabond and other idle and disorderly persons (1764) (reprinted in First Laws of the State of Georgia 431–433 (J. Cushing comp. 1981)); Laws of the Colony of New York 4, ch. 1021 (1756); 1 Laws of the Commonwealth of Pennsylvania, ch. DLV (1767) (An Act to prevent the mischiefs arising from the increase of vagabonds, and other idle and disorderly persons, within this province); Laws of the State of Vermont § 10 (1797).

[3] See, e. g., Kan. Stat., ch. 161, § 1 (1855); Ky. Rev. Stat., ch. CIV, § 1 (1852); Pa. Laws, ch. 664, § V (1853); N. Y. Rev. Stat., ch. XX, § 1 (1859); Ill. Stat., ch. 30, § CXXXVIII (1857). During the 19th century, this Court acknowledged the States' power to criminalize vagrancy on several occasions. See Mayor of New York v. Miln, 11 Pet. 102, 148 (1837); Passenger Cases, 7 How. 283, 425 (1849) (opinion of Wayne, J.); Prigg v. Pennsylvania, 16 Pet. 539, 625 (1842).

[4] See generally C. Tiedeman, Limitations of Police Power in the United States 116–117 (1886) ("The vagrant has been very appropriately described as the chrysalis of every species of criminal. A wanderer through the land, without home ties, idle, and without apparent means of support, what but criminality is to be expected from such a person? If vagrancy could be successfully combated . . . the infractions of the law would be reduced to a surprisingly small number; and it is not to be wondered at that an effort is so generally made to suppress vagrancy"). See also R. I. Gen. Stat., ch. 232, § 24 (1872); Ill. Rev. Stat., ch. 38, § 270 (1874); Conn. Gen. Stat., ch. 3, § 7 (1875); N. H. Gen. Laws, ch. 269, § 17 (1878); Cal. Penal Code § 647 (1885); Ohio Rev. Stat., Tit. 1, ch. 8, §§ 6994, 6995 (1886); Colo. Rev. Stat., ch. 36, § 1362 (1891); Del. Rev. Stat., ch. 92, Vol. 12, p. 962 (1861); Ky. Stat., ch. 132, § 4758 (1894); Ill. Rev. Stat., ch. 38, § 270 (1895); Ala. Code, ch. 199, § 5628 (1897); Ariz. Rev. Stat., Tit. 17, § 599 (1901); N. Y. Crim. Code § 887 (1902); Pa. Stat. §§ 21409, 21410 (1920); Ky. Stat. § 4758–1 (1922); Ala. Code, ch. 244, § 5571 (1923); Kan. Rev. Stat. § 21–2402 (1923); Ill. Stat. Ann., § 606 (1924); Ariz. Rev. Stat., ch. 111, § 4868 (1928); Cal. Penal Code, Pt. 1, Tit. 15, ch. 2, § 647 (1929); Pa. Stat. Ann., Tit. 18, § 2032 (Pur-

Tellingly, the plurality cites only three cases in support of the asserted right to "loiter for innocent purposes." See *ante*, at 53–54. Of those, only one—decided more than 100 years after the ratification of the Fourteenth Amendment—actually addressed the validity of a vagrancy ordinance. That case, *Papachristou, supra*, contains some dicta that can be read to support the fundamental right that the plurality asserts.[5] However, the Court in *Papachristou* did not undertake the now-accepted analysis applied in substantive due process cases—it did not look to tradition to define the rights protected by the Due Process Clause. In any event, a careful reading of the opinion reveals that the Court never said anything about a constitutional right. The Court's holding was that the antiquarian language employed in the vagrancy ordinance at issue was unconstitutionally vague. See *id.*, at 162–163. Even assuming, then, that *Papachristou* was correctly decided as an original matter—a doubtful proposi-

---

don 1945); Kan. Gen. Stat. Ann. §21–2409 (1949); N. Y. Crim. Code §887 (1952); Colo. Rev. Stat. Ann. §40–8–20 (1954); Cal. Penal Code §647 (1953); 1 Ill. Rev. Stat., ch. 38, §578 (1953); Ky. Rev. Stat. §436.520 (1953); 5 Ala. Code, Tit. 14, §437 (1959); Pa. Stat. Ann., Tit. 18, §2032 (Purdon 1963); Kan. Stat. Ann. §21–2409 (1964).

[5] The other cases upon which the plurality relies concern the entirely distinct right to interstate and international travel. See *Williams* v. *Fears*, 179 U. S. 270, 274–275 (1900); *Kent* v. *Dulles*, 357 U. S. 116 (1958). The plurality claims that dicta in those cases articulating a right of free movement, see *Williams, supra*, at 274; *Kent, supra*, at 125, also supports an individual's right to "remain in a public place of his choice." Ironically, *Williams* rejected the argument that a tax on persons engaged in the business of importing out-of-state labor impeded the freedom of transit, so the precise holding in that case does not support, but undermines, the plurality's view. Similarly, the precise holding in *Kent* did not bear on a constitutional right to travel; instead, the Court held only that Congress had not authorized the Secretary of State to deny certain passports. Furthermore, the plurality's approach distorts the principle articulated in those cases, stretching it to a level of generality that permits the Court to disregard the relevant historical evidence that should guide the analysis. *Michael H.* v. *Gerald D.*, 491 U. S. 110, 127, n. 6 (1989) (plurality opinion).

tion—it does not compel the conclusion that the Constitution protects the right to loiter for innocent purposes. The plurality's contrary assertion calls to mind the warning that "[t]he Judiciary, including this Court, is the most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or even the design of the Constitution. . . . [We] should be extremely reluctant to breathe still further substantive content into the Due Process Clause so as to strike down legislation adopted by a State or city to promote its welfare." *Moore*, 431 U. S., at 544 (White, J., dissenting). When "the Judiciary does so, it unavoidably pre-empts for itself another part of the governance of the country without express constitutional authority." *Ibid.*

### B

The Court concludes that the ordinance is also unconstitutionally vague because it fails to provide adequate standards to guide police discretion and because, in the plurality's view, it does not give residents adequate notice of how to conform their conduct to the confines of the law. I disagree on both counts.

### 1

At the outset, it is important to note that the ordinance does not criminalize loitering *per se.* Rather, it penalizes loiterers' failure to obey a police officer's order to move along. A majority of the Court believes that this scheme vests too much discretion in police officers. Nothing could be further from the truth. Far from according officers too much discretion, the ordinance merely enables police officers to fulfill one of their traditional functions. Police officers are not, and have never been, simply enforcers of the criminal law. They wear other hats—importantly, they have long been vested with the responsibility for preserving the public peace. See, *e. g.*, O. Allen, Duties and Liabilities of Sheriffs

59 (1845) ("As the principal conservator of the peace in his county, and as the calm but irresistible minister of the law, the duty of the Sheriff is no less important than his authority is great"); E. Freund, Police Power § 86, p. 87 (1904) ("The criminal law deals with offenses after they have been committed, the police power aims to prevent them. The activity of the police for the prevention of crime is partly such as needs no special legal authority"). Nor is the idea that the police are also *peace officers* simply a quaint anachronism. In most American jurisdictions, police officers continue to be obligated, by law, to maintain the public peace.[6]

In their role as peace officers, the police long have had the authority and the duty to order groups of individuals who threaten the public peace to disperse. For example, the 1887 police manual for the city of New York provided:

_____

[6] See, *e. g.*, Ark. Code Ann. § 12–8–106(b) (Supp. 1997) ("The Department of Arkansas State Police shall be conservators of the peace"); Del. Code Ann., Tit. IX, § 1902 (1989) ("All police appointed under this section shall see that the peace and good order of the State . . . be duly kept"); Ill. Comp. Stat., ch. 65, § 5/11–1–2(a) (1998) ("Police officers in municipalities shall be conservators of the peace"); La. Rev. Stat. Ann. § 40:1379 (West 1992) ("Police employees . . . shall . . . keep the peace and good order"); Mo. Rev. Stat. § 85.561 (1998) ("[M]embers of the police department shall be conservators of the peace, and shall be active and vigilant in the preservation of good order within the city"); N. H. Rev. Stat. Ann. § 105:3 (1990) ("All police officers are, by virtue of their appointment, constables and conservators of the peace"); Ore. Rev. Stat. § 181.110 (1997) ("Police to preserve the peace, to enforce the law and to prevent and detect crime"); 351 Pa. Code, Tit. 351, § 5.5–200 (1998) ("The Police Department . . . shall preserve the public peace, prevent and detect crime, police the streets and highways and enforce traffic statutes, ordinances and regulations relating thereto"); Tex. Code Crim. Proc. Ann., Art. 2.13 (Vernon 1977) ("It is the duty of every peace officer to preserve the peace within his jurisdiction"); Vt. Stat. Ann., Tit. 24, § 299 (1992) ("A sheriff shall preserve the peace, and suppress, with force and strong hand, if necessary, unlawful disorder"); Va. Code Ann. § 15.2–1704(A) (Supp. 1998) ("The police force . . . is responsible for the prevention and detection of crime, the apprehension of criminals, the safeguard of life and property, the preservation of peace and the enforcement of state and local laws, regulations, and ordinances").

"It is hereby made the duty of the Police Force at all times of day and night, and the members of such Force are hereby thereunto empowered, to especially preserve the public peace, prevent crime, detect and arrest offenders, suppress riots, mobs and insurrections, *disperse unlawful or dangerous assemblages, and assemblages which obstruct the free passage of public streets, sidewalks, parks and places.*" Manual Containing the Rules and Regulations of the Police Department of the City of New York, Rule 414 (emphasis added).

See also J. Crocker, Duties of Sheriffs, Coroners and Constables § 48, p. 33 (2d ed. rev. 1871) ("Sheriffs are, *ex officio,* conservators of the peace within their respective counties, and it is their duty, as well as that of all constables, coroners, marshals and other peace officers, to prevent every breach of the peace, and to *suppress every unlawful assembly,* affray or riot which may happen in their presence" (emphasis added)). The authority to issue dispersal orders continues to play a commonplace and crucial role in police operations, particularly in urban areas.[7] Even the ABA Standards for

---

[7] For example, the following statutes provide a criminal penalty for the failure to obey a dispersal order: Ala. Code § 13A–11–6 (1994); Ariz. Rev. Stat. Ann. § 13–2902(A)(2) (1989); Ark. Code Ann. § 5–71–207(a)(6) (1993); Cal. Penal Code Ann. § 727 (West 1985); Colo. Rev. Stat. § 18–9–107(b) (1997); Del. Code Ann., Tit. 11, § 1321 (1995); Ga. Code Ann. § 16–11–36 (1996); Guam Code Ann., Tit. 9, § 61.10(b) (1996); Haw. Rev. Stat. § 711–1102 (1993); Idaho Code § 18–6410 (1997); Ill. Comp. Stat., ch. 720, § 5/25–1(e) (1998); Ky. Rev. Stat. Ann. §§ 525.060, 525.160 (Baldwin 1990); Me. Rev. Stat. Ann., Tit. 17A, § 502 (1983); Mass. Gen. Laws, ch. 269, § 2 (1992); Mich. Comp. Laws § 750.523 (1991); Minn. Stat. § 609.715 (1998); Miss. Code Ann. § 97–35–7(1) (1994); Mo. Rev. Stat. § 574.060 (1994); Mont. Code Ann. § 45–8–102 (1997); Nev. Rev. Stat. § 203.020 (1995); N. H. Rev. Stat. Ann. §§ 644:1, 644:2(II)(e) (1996); N. J. Stat. Ann. § 2C:33–1b (West 1995); N. Y. Penal Law § 240.20(6) (McKinney 1989); N. C. Gen. Stat. § 14–288.5(a) (1999); N. D. Cent. Code § 12.1–25–04 (1997); Ohio Rev. Code Ann. § 2917.13(A)(2) (1997); Okla. Stat., Tit. 21, § 1316 (1991); Ore. Rev. Stat. § 166.025(1)(e) (1997); 18 Pa. Cons. Stat. § 5502 (1983); R. I. Gen. Laws § 11–38–2 (1994); S. C. Code Ann. § 16–7–10(a) (1985); S. D. Codified Laws

Criminal Justice recognize that "[i]n day-to-day police experience there are innumerable situations in which police are called upon to order people not to block the sidewalk, not to congregate in a given place, and not to 'loiter' . . . . The police may suspect the loiterer of considering engaging in some form of undesirable conduct that can be at least temporarily frustrated by ordering him or her to 'move on.'" Standard 1–3.4(d), p. 1.88, and comments (2d ed. 1980, Supp. 1986).[8]

In order to perform their peacekeeping responsibilities satisfactorily, the police inevitably must exercise discretion. Indeed, by empowering them to act as peace officers, the law assumes that the police will exercise that discretion responsibly and with sound judgment. That is not to say that the law should not provide objective guidelines for the police, but simply that it cannot rigidly constrain their every action. By directing a police officer not to issue a dispersal order unless he "observes a person whom he reasonably believes to be a criminal street gang member loitering in any public place," App. to Pet. for Cert. 61a, Chicago's ordinance strikes an appropriate balance between those two extremes. Just as we trust officers to rely on their experience and expertise in order to make spur-of-the-moment determinations about amorphous legal standards such as "probable cause"

§ 22–10–11 (1998); Tenn. Code Ann. § 39–17–305(2) (1997); Tex. Penal Code Ann. § 42.03(a)(2) (1994); Utah Code Ann. § 76–9–104 (1995); Vt. Stat. Ann., Tit. 13, § 901 (1998); Va. Code Ann. § 18.2–407 (1996); V. I. Code Ann., Tit. 5, § 4022 (1997); Wash. Rev. Code § 9A.84.020 (1994); W. Va. Code § 61–6–1 (1997); Wis. Stat. § 947.06(3) (1994).

[8] See also Ind. Code § 36–8–3–10(a) (1993) ("The police department shall, within the city: (1) preserve peace; (2) prevent offenses; (3) detect and arrest criminals; (4) suppress riots, mobs, and insurrections; (5) disperse unlawful and dangerous assemblages and assemblages that obstruct the free passage of public streets, sidewalks, parks, and places . . ."); Okla. Stat., Tit. 19, § 516 (1991) ("It shall be the duty of the sheriff . . . to keep and preserve the peace of their respective counties, and to quiet and suppress all affrays, riots and unlawful assemblies and insurrections . . .").

and "reasonable suspicion," so we must trust them to determine whether a group of loiterers contains individuals (in this case members of criminal street gangs) whom the city has determined threaten the public peace. See *Ornelas* v. *United States*, 517 U. S. 690, 695, 700 (1996) ("Articulating precisely what 'reasonable suspicion' and 'probable cause' mean is not possible. They are commonsense, nontechnical conceptions that deal with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. . . . [O]ur cases have recognized that a police officer may draw inferences based on his own experience in deciding whether probable cause exists" (citations and internal quotation marks omitted)). In sum, the Court's conclusion that the ordinance is impermissibly vague because it " 'necessarily entrusts lawmaking to the moment-to-moment judgment of the policeman on his beat,' " *ante*, at 60, cannot be reconciled with common sense, longstanding police practice, or this Court's Fourth Amendment jurisprudence.

The illogic of the Court's position becomes apparent when it opines that the ordinance's dispersal provision "would no doubt be sufficient if the ordinance only applied to loitering that had an apparently harmful purpose or effect, or possibly if it only applied to loitering by persons reasonably believed to be criminal gang members." *Ante*, at 62 (footnote omitted). See also *ante*, at 67 (O'CONNOR, J., concurring in part and concurring in judgment) (endorsing Court's proposal). With respect, if the Court believes that the ordinance is vague as written, this suggestion would not cure the vagueness problem. First, although the Court has suggested that a scienter requirement may mitigate a vagueness problem "with respect to the adequacy of notice to the complainant that his conduct is proscribed," *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U. S. 489, 499 (1982) (footnote omitted), the alternative proposal does not incorporate a scienter requirement. If the ordinance's prohibition were lim-

ited to loitering with "an apparently harmful purpose," the criminality of the conduct would continue to depend on its external appearance, rather than the loiterer's state of mind. See Black's Law Dictionary 1345 (6th ed. 1990) (scienter "is frequently used to signify the defendant's guilty knowledge"). For this reason, the proposed alternative would neither satisfy the standard suggested in *Hoffman Estates* nor serve to channel police discretion. Indeed, an ordinance that required officers to ascertain whether a group of loiterers have "an apparently harmful purpose" would require them to exercise *more* discretion, not less. Furthermore, the ordinance in its current form—requiring the dispersal of groups that contain at least one gang member—actually vests less discretion in the police than would a law requiring that the police disperse groups that contain *only* gang members. Currently, an officer must reasonably suspect that one individual is a member of a gang. Under the plurality's proposed law, an officer would be required to make such a determination multiple times.

In concluding that the ordinance adequately channels police discretion, I do not suggest that a police officer enforcing the Gang Congregation Ordinance will never make a mistake. Nor do I overlook the *possibility* that a police officer, acting in bad faith, might enforce the ordinance in an arbitrary or discriminatory way. But our decisions should not turn on the proposition that such an event will be anything but rare. Instances of arbitrary or discriminatory enforcement of the ordinance, like any other law, are best addressed when (and if) they arise, rather than prophylactically through the disfavored mechanism of a facial challenge on vagueness grounds. See *United States* v. *Salerno*, 481 U. S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid").

2

The plurality's conclusion that the ordinance "fails to give the ordinary citizen adequate notice of what is forbidden and what is permitted," *ante*, at 60, is similarly untenable. There is nothing "vague" about an order to disperse.[9] While "we can never expect mathematical certainty from our language," *Grayned* v. *City of Rockford*, 408 U. S. 104, 110 (1972), it is safe to assume that the vast majority of people who are ordered by the police to "disperse and remove themselves from the area" will have little difficulty understanding how to comply. App. to Pet. for Cert. 61a.

Assuming that we are also obligated to consider whether the ordinance places individuals on notice of what conduct might subject them to such an order, respondents in this facial challenge bear the weighty burden of establishing that the statute is vague in all its applications, "in the sense that no standard of conduct is specified at all." *Coates* v. *Cincinnati*, 402 U. S. 611, 614 (1971). I subscribe to the view of retired Justice White—"If any fool would know that a particular category of conduct would be within the reach of the statute, if there is an unmistakable core that a reasonable person would know is forbidden by the law, the enactment is not unconstitutional on its face." *Kolender*, 461 U. S., at 370–371 (dissenting opinion). This is certainly such a case. As the Illinois Supreme Court recognized, "persons of ordinary intelligence may maintain a common and accepted

---

[9] The plurality suggests, *ante*, at 59, that dispersal orders are, by their nature, vague. The plurality purports to distinguish its sweeping condemnation of dispersal orders from *Colten* v. *Kentucky*, 407 U. S. 104 (1972), but I see no principled ground for doing so. The logical implication of the plurality's assertion is that the police can never issue dispersal orders. For example, in the plurality's view, it is apparently unconstitutional for a police officer to ask a group of gawkers to move along in order to secure a crime scene.

meaning of the word 'loiter.'" 177 Ill. 2d, at 451, 687 N. E. 2d, at 61.

JUSTICE STEVENS' contrary conclusion is predicated primarily on the erroneous assumption that the ordinance proscribes large amounts of constitutionally protected and/or innocent conduct. See *ante,* at 55, 56–57, 60. As already explained, *supra,* at 102–106, the ordinance does not proscribe constitutionally protected conduct—there is no fundamental right to loiter. It is also anomalous to characterize loitering as "innocent" conduct when it has been disfavored throughout American history. When a category of conduct has been consistently criminalized, it can hardly be considered "innocent." Similarly, when a term has long been used to describe criminal conduct, the need to subject it to the "more stringent vagueness test" suggested in *Hoffman Estates,* 455 U. S., at 499, dissipates, for there is no risk of a trap for the unwary. The term "loiter" is no different from terms such as "fraud," "bribery," and "perjury." We expect people of ordinary intelligence to grasp the meaning of such legal terms despite the fact that they are arguably imprecise.[10]

The plurality also concludes that the definition of the term loiter—"to remain in any one place with no apparent pur-

---

[10] For example, a 1764 Georgia law declared that "all able bodied persons . . . who shall be found loitering . . . , all other idle vagrants, or disorderly persons wandering abroad without betaking themselves to some lawful employment or honest labor, shall be deemed and adjudged vagabonds," and required the apprehension of "any such vagabond . . . found within any county in this State, wandering, strolling, loitering about" (reprinted in First Laws of the State of Georgia, Part 1, 376–377 (J. Cushing comp. 1981)). See also, *e. g.,* Digest of Laws of Pennsylvania 829 (F. Brightly 8th ed. 1853) ("The following described persons shall be liable to the penalties imposed by law upon vagrants . . . . All persons who shall . . . be found loitering"); Ky. Rev. Stat., ch. CIV, §1, p. 69 (1852) ("If any able bodied person be found loitering or rambling about, . . . he shall be taken and adjudged to be a vagrant, and guilty of a high misdemeanor").

pose," see 177 Ill. 2d, at 445, 687 N. E. 2d, at 58—fails to provide adequate notice.[11] "It is difficult to imagine," the plurality posits, "how any citizen of the city of Chicago standing in a public place . . . would know if he or she had an 'apparent purpose.'" *Ante*, at 56–57. The plurality underestimates the intellectual capacity of the citizens of Chicago. Persons of ordinary intelligence are perfectly capable of evaluating how outsiders perceive their conduct, and here "[i]t is self-evident that there is a whole range of conduct that anyone with at least a semblance of common sense would know is [loitering] and that would be covered by the statute." See *Smith* v. *Goguen*, 415 U. S. 566, 584 (1974) (White, J., concurring in judgment). Members of a group standing on the corner staring blankly into space, for example, are likely well aware that passersby would conclude that they have "no apparent purpose." In any event, because this is a facial challenge, the plurality's ability to hypothesize that some individuals, in some circumstances, may be unable to ascertain how their actions appear to outsiders is irrelevant to our analysis. Here, we are asked to determine whether the ordinance is "vague in all of its applications." *Hoffman Estates*, *supra*, at 497. The answer is unquestionably no.

\* \* \*

Today, the Court focuses extensively on the "rights" of gang members and their companions. It can safely do so— the people who will have to live with the consequences of

---

[11] The Court asserts that we cannot second-guess the Illinois Supreme Court's conclusion that the definition "'provides absolute discretion to police officers to decide what activities constitute loitering,'" *ante*, at 61 (quoting 177 Ill. 2d, at 457, 687 N. E. 2d, at 63). While we are bound by a state court's construction of a statute, the Illinois court "did not, strictly speaking, construe the [ordinance] in the sense of defining the meaning of a particular statutory word or phase. Rather, it merely characterized [its] 'practical effect' . . . . This assessment does not bind us." *Wisconsin* v. *Mitchell*, 508 U. S. 476, 484 (1993).

today's opinion do not live in our neighborhoods. Rather, the people who will suffer from our lofty pronouncements are people like Ms. Susan Mary Jackson; people who have seen their neighborhoods literally destroyed by gangs and violence and drugs. They are good, decent people who must struggle to overcome their desperate situation, against all odds, in order to raise their families, earn a living, and remain good citizens. As one resident described: "There is only about maybe one or two percent of the people in the city causing these problems maybe, but it's keeping 98 percent of us in our houses and off the streets and afraid to shop." Transcript 126. By focusing exclusively on the imagined "rights" of the two percent, the Court today has denied our most vulnerable citizens the very thing that JUSTICE STEVENS, *ante*, at 54, elevates above all else—the "'freedom of movement.'" And that is a shame. I respectfully dissent.